# UNITED STATES *v.* DINITZ

No. 74–928.  Argued December 2, 1975—Decided March 8, 1976

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. BURGER, C. J., filed a concurring opinion, *post*, p. 612. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 613. STEVENS, J., took no part in the consideration or decision of the case.

*John P. Rupp* argued the cause for the United States. With him on the brief were *Solicitor General Bork, Acting Assistant Attorney General Keeney, Deputy Solicitor General Frey,* and *Jerome M. Feit.*

*Fletcher N. Baldwin, Jr.,* by appointment of the Court, 421 U. S. 906, argued the cause and filed a brief for respondent.

MR. JUSTICE STEWART delivered the opinion of the Court.

The question in this case is whether the Double Jeopardy Clause of the Fifth Amendment was violated by the retrial of the respondent after his original trial had ended in a mistrial granted at his request.

## I

The respondent, Nathan Dinitz, was arrested on December 8, 1972, following the return of an indictment charging him with conspiracy to distribute LSD and with

distribution of that controlled substance in violation of 84 Stat. 1260, 1265, 21 U. S. C. §§ 841 (a)(1), 846. On the day of his arrest, the respondent retained a lawyer named Jeffrey Meldon to represent him. Meldon appeared with the respondent at his arraignment, filed numerous pre-trial motions on his behalf, and was completely responsible for the preparation of the case until shortly before trial. Some five days before the trial was scheduled to begin, the respondent retained another lawyer, Maurice Wagner, to conduct his defense. Wagner had not been admitted to practice before the United States District Court for the Northern District of Florida, but on the first day of the trial the court permitted him to appear *pro hac vice*. In addition to Meldon and Wagner, Fletcher Baldwin, a professor of law at the University of Florida, also appeared on the respondent's behalf.[1]

The jury was selected and sworn on February 14, 1973, and opening statements by counsel began on the following afternoon. The prosecutor's opening statement briefly outlined the testimony that he expected an under-cover agent named Steve Cox to give regarding his purchase of LSD from the respondent. Wagner then began his opening statement for the defense. After introducing himself and his co-counsel, Wagner turned to the case against the respondent:

> "Mr. Wagner: After working on this case over a period of time it appeared to me that if we would have given nomenclature, if we would have named this case so there could be no question about identifying it in the future, I would have called it The Case—
>
> "Mr. Reed [Asst. U. S. Attorney]: Your Honor, we object to personal opinions.

---

[1] Wagner informed the trial judge that he would try the facts of the respondent's case and Baldwin would make arguments of law.

"The Court: Objection sustained. The purpose of the opening statement is to summarize the facts the evidence will show, state the issues, not to give personal opinions. Proceed, Mr. Wagner.

"Mr. Wagner: Thank you, Your Honor. I call this the Case of the Incredible Witness." App. 20.

The prosecutor again objected and the judge excused the jury. The judge then warned Wagner that he did not approve of his behavior and cautioned Wagner that he did not want to have to remind him again about the purpose of the opening statement.

Following this initial incident, the trial judge found it necessary twice again to remind Wagner of the purpose of the opening statement and to instruct him to relate "the facts that you expect the evidence to show, the admissible evidence." Id., at 82. Later on in his statement, Wagner started to discuss an attempt to extort money from the respondent that had occurred shortly after his arrest. The prosecutor objected and the jury was again excused. Wagner informed the trial judge of some of the details of the extortion attempt and assured the court that he would connect it with the prospective Government witness Cox. But it soon became apparent that Wagner had no information linking Cox to the extortion attempt, and the trial judge then excluded Wagner from the trial and ordered him to leave the courthouse.[2]

---

[2] Shortly after the arrest of the respondent, someone had telephoned him and said that for $2,000 he would make sure that the case never came to court. The respondent and FBI agents set up a trap to catch the caller, but the unidentified man got away with the "bait envelope."

During the discussion of the incident at the bench, Wagner claimed that, if the description of the man fit Cox, the credibility of

The judge then asked Meldon if he was prepared to proceed with the trial.[3]   Upon learning that Meldon had not discussed the case with the witnesses, the judge gave Meldon until 9 o'clock the following morning to prepare. Meldon informed the judge that the respondent was "in a quandary because he hired Mr. Wagner to argue the case and he feels he needs more time to obtain outside counsel to argue the case for him."   The judge responded that "[y]ou are his counsel and have been" but stated that he would consider the matter "between now and 9:00 o'clock tomorrow morning."   *Id.*, at 35.

The next morning, Meldon told the judge that the respondent wanted Wagner and not himself or Baldwin to try the case.   The judge then set forth three alternative courses that might be followed—(1) a stay or recess pending application to the Court of Appeals to review the propriety of expelling Wagner, (2) continuation of the trial with Meldon and Baldwin as counsel, or (3) a declaration of a mistrial which would permit the respondent to obtain other counsel.   Following a short recess, Meldon moved for a mistrial, stating that, after "full consideration of the situation and an explanation of the alternatives before him, [the respondent] feels that he would move for a mistrial and that this would be in his

the chief Government witness would be placed in doubt.   The judge then ordered that the FBI agents be called to determine if the person taking the envelope resembled Cox.   When they arrived, Wagner admitted that he had never seen or talked to the agents. The FBI agents later informed the judge *in camera* that the person who picked up the "bait envelope" containing the fake money bore no resemblance to Agent Cox.

[3] After the judge excluded Wagner, he examined Meldon about his role in the preparation of the opening statement.   Meldon responded that he had conveyed information about the extortion attempt to Wagner but had not represented that Cox was involved and had not worked with Wagner on the opening statement.

best interest." *Id.*, at 41. The Government prosecutor did not oppose the motion. The judge thereupon declared a mistrial, expressing his belief that such a course would serve the interest of justice.

Before his second trial, the respondent moved to dismiss the indictment on the ground that a retrial would violate the Double Jeopardy Clause of the Constitution. This motion was denied. The respondent represented himself at the new trial, and he was convicted by the jury on both the conspiracy and distribution counts.[4] A divided panel of the Court of Appeals for the Fifth Circuit reversed the conviction, holding that the retrial violated the respondent's constitutional right not to be twice put in jeopardy.[5] 492 F. 2d 53. The appellate court took the view that the trial judge's exclusion of Wagner and his questioning of Meldon had left the respondent no choice but to move for a mistrial. *Id.*, at 59. On that basis, the court concluded that the respondent's request for a mistrial should be ignored and the case should be treated as though the trial judge had declared a mistrial over the objection of the defendant. *Ibid.* So viewing the case, the court held that the Double Jeopardy Clause barred the second trial of the respondent, because there had been no manifest necessity requiring the expulsion of Wagner.[6] The Court of Appeals

---

[4] The respondent was a third-year law student at the time of his arrest.

[5] The Court of Appeals dealt only with the respondent's double jeopardy claim and did not reach any of his other claims of error. 492 F. 2d 53, 54.

[6] The Court of Appeals held that the trial judge failed to consider adequate alternatives available to deal with Wagner's conduct. Among the alternatives the court suggested were a warning that he would be cited for contempt if the practices continued, an actual citation for contempt, filing of a complaint with the grievance committee of the state bar, and taking action to prevent him from prac-

granted rehearing en banc and, by a vote of 8–7, affirmed the decision of the panel.[7]   504 F. 2d 854.   We granted certiorari to consider the constitutional question thus presented.   420 U. S. 1003.

## II

The Double Jeopardy Clause of the Fifth Amendment protects a defendant in a criminal proceeding against multiple punishments or repeated prosecutions for the same offense.[8]   See *United States* v. *Wilson,* 420 U. S. 332, 343; *North Carolina* v. *Pearce,* 395 U. S. 711, 717. Underlying this constitutional safeguard is the belief that "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."   *Green* v. *United States,* 355 U. S. 184, 187–188.   Where, as here, a mistrial has been declared, the defendant's "valued right to have his trial completed by a particular tribunal" is also implicated.   *Wade* v. *Hunter,* 336 U. S. 684, 689; *United States* v. *Jorn,* 400 U. S. 470, 484–485 (plurality opinion); *Downum* v. *United States,* 372 U. S. 734, 736.

Since Mr. Justice Story's 1824 opinion for the Court in *United States* v. *Perez,* 9 Wheat. 579, 580, this Court has held that the question whether under the Double Jeopardy Clause there can be a new trial after a mistrial

---

ticing again in the United States District Court for the Northern District of Florida.   *Id.,* at 60–61.

[7] The court's en banc *per curiam* opinion employed reasoning similar to that of the panel majority.   See n. 10, *infra.*

[8] The Double Jeopardy Clause of the Fifth Amendment was held to be applicable to the States through the Fourteenth Amendment in *Benton* v. *Maryland,* 395 U. S. 784.

has been declared without the defendant's request or consent depends on whether "there is a manifest necessity for the [mistrial], or the ends of public justice would otherwise be defeated." *Illinois* v. *Somerville,* 410 U. S. 458, 461; *United States* v. *Jorn, supra,* at 481; *Gori* v. *United States,* 367 U. S. 364, 368–369; *Wade* v. *Hunter, supra,* at 689–690; *Simmons* v. *United States,* 142 U. S. 148, 153–154. Different considerations obtain, however, when the mistrial has been declared at the defendant's request.[9] The reasons for the distinction were discussed in the plurality opinion in the *Jorn* case:

> "If that right to go to a particular tribunal is valued, it is because, independent of the threat of bad-faith conduct by judge or prosecutor, the defendant has a significant interest in the decision whether or not to take the case from the jury when circumstances occur which might be thought to warrant a declaration of mistrial. Thus, where circumstances develop not attributable to prosecutorial or judicial overreaching, a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error. In the absence of such a motion, the *Perez* doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings.

---

[9] See *United States* v. *Tateo,* 377 U. S. 463, 467: "If Tateo had *requested* a mistrial on the basis of the judge's comments, there would be no doubt that if he had been successful, the Government would not have been barred from retrying him." (Emphasis in original.)

See *United States* v. *Perez,* 9 Wheat., at 580." 400 U. S., at 485 (footnote omitted).

The distinction between mistrials declared by the court *sua sponte* and mistrials granted at the defendant's request or with his consent is wholly consistent with the protections of the Double Jeopardy Clause. Even when judicial or prosecutorial error prejudices a defendant's prospects of securing an acquittal, he may nonetheless desire "to go to the first jury and, perhaps, end the dispute then and there with an acquittal." *United States* v. *Jorn, supra,* at 484. Our prior decisions recognize the defendant's right to pursue this course in the absence of circumstances of manifest necessity requiring a *sua sponte* judicial declaration of mistrial. But it is evident that when judicial or prosecutorial error seriously prejudices a defendant, he may have little interest in completing the trial and obtaining a verdict from the first jury. The defendant may reasonably conclude that a continuation of the tainted proceeding would result in a conviction followed by a lengthy appeal and, if a reversal is secured, by a second prosecution. In such circumstances, a defendant's mistrial request has objectives not unlike the interests served by the Double Jeopardy Clause—the avoidance of the anxiety, expense, and delay occasioned by multiple prosecutions.

The Court of Appeals viewed the doctrine that permits a retrial following a mistrial sought by the defendant as resting on a waiver theory. The court concluded, therefore, that "something more substantial than a Hobson's choice" is required before a defendant can "be said to have relinquished voluntarily his right to proceed before the first jury."[10] See 492 F. 2d, at 59. The court thus

---

[10] The brief *per curiam* opinion of the Court of Appeals en banc concluded:

"In order for a defendant's motion for a mistrial to constitute a

held that no waiver could be imputed to the respondent because the trial judge's action in excluding Wagner left the respondent with "no choice but to move for or accept a mistrial." *Ibid.* But traditional waiver concepts have little relevance where the defendant must determine whether or not to request or consent to a mistrial in response to judicial or prosecutorial error. See *United States v. Jorn,* 400 U. S., at 484–485, n. 11; *United States v. Jamison,* 164 U. S. App. D. C. 300, 305–306, 505 F. 2d 407, 412–413. In such circumstances, the defendant generally does face a "Hobson's choice" between giving up his first jury and continuing a trial tainted by prejudicial judicial or prosecutorial error. The important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of such error.[11]

bar to a later plea of double jeopardy, some choice to proceed or start over must remain with the defendant at the time his motion is made. The dicta from United States v. Jorn . . . does not encompass the extraordinary circumstances of the present case, in which judicial error alone, rather than defendant's exercise of any option to stop or go forward, took away his 'valued right to have his trial completed by a particular tribunal.' " 504 F. 2d 854–855 (footnote omitted).

[11] The respondent characterizes a defendant's mistrial motion as a waiver of "his right not to be placed twice in jeopardy" and argues that to be valid the waiver must meet the knowing, intelligent, and voluntary standard set forth in *Johnson v. Zerbst,* 304 U. S. 458. This approach erroneously treats the defendant's interest in going forward before the first jury as a constitutional right comparable to the right to counsel. It fails to recognize that the protection against the burden of multiple prosecutions underlying the constitutional prohibition against double jeopardy may be served by a mistrial declaration and the concomitant relinquishment of the opportunity to obtain a verdict from the first jury. This Court has implicitly rejected the contention that the permissibility of a retrial

. The Court of Appeals' determination that the manifest necessity standard should be applied to a mistrial motion when the defendant has "no choice" but to request a mistrial undermines rather than furthers the protections of the Double Jeopardy Clause. In the event of severely prejudicial error a defendant might well consider an immediate new trial a preferable alternative to the prospect of a probable conviction followed by an appeal, a reversal of the conviction, and a later retrial. Yet the Court of Appeals' decision, in effect, instructs trial judges to reject the most meritorious mistrial motion in the absence of manifest necessity and to require, instead, that the trial proceed to its conclusion despite a legitimate claim of seriously prejudicial error.[12] For if a trial judge follows that course, the Double Jeopardy Clause will present no obstacle to a retrial if the conviction is set aside by the trial judge or reversed on appeal. *United States* v. *Ball,* 163 U. S. 662.[13]

following a mistrial or a reversal of a conviction on appeal depends on a knowing, voluntary, and intelligent waiver of a constitutional right. See *Breed* v. *Jones,* 421 U. S. 519, 534; *United States* v. *Wilson,* 420 U. S. 332, 343–344, n. 11; *United States* v. *Jorn,* 400 U. S. 470, 484–485, n. 11 (plurality opinion); *United States* v. *Tateo,* 377 U. S., at 466.

[12] As the dissenting judge on the original Court of Appeals panel noted, the court's decision would "give rise to much reluctance in granting mistrials" because "[t]he trial courts will understand that society will be better served by completing a trial, even after clear error has arisen and the defendant seeks the mistrial, than the alternative of a mistrial and the possible bar of double jeopardy based on the error." 492 F. 2d, at 63 (Bell, J., dissenting).

[13] This Court's decisions permitting retrials after convictions have been set aside at the defendant's behest clearly indicate "that the defendant's double jeopardy interests, however defined, do not go so far as to compel society to so mobilize its decisionmaking resources that it will be prepared to assure the defendant a single proceeding free from harmful governmental or judicial error." *United States* v.

The Double Jeopardy Clause does protect a defendant against governmental actions intended to provoke mistrial requests and thereby to subject defendants to the substantial burdens imposed by multiple prosecutions. It bars retrials where "bad-faith conduct by judge or prosecutor," *United States* v. *Jorn, supra,* at 485, threatens the "[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict" the defendant. *Downum* v. *United States,* 372 U. S., at 736. See *Gori* v. *United States,* 367 U. S., at 369; *United States* v. *Jorn, supra,* at 489 (STEWART, J., dissenting); cf. *Wade* v. *Hunter,* 336 U. S., at 692.

But here the trial judge's banishment of Wagner from the proceedings was not done in bad faith in order to goad the respondent into requesting a mistrial or to prejudice his prospects for an acquittal. As the Court of Appeals noted, Wagner "was guilty of improper conduct" during his opening statement which "may have justified disciplinary action," 492 F. 2d, at 60–61. Even accepting the appellate court's conclusion that the trial judge overreacted in expelling Wagner from the courtroom, *ibid.,* the court did not suggest, the respondent has not contended, and the record does not show that the judge's action was motivated by bad faith or undertaken to harass or prejudice the respondent.[14]

Under these circumstances we hold that the Court of Appeals erred in finding that the retrial violated the

*Jorn, supra,* at 484. See *United States* v. *Tateo, supra,* at 466; cf. *Wade* v. *Hunter,* 336 U. S. 684, 688–689.

[14] The record indicates that the judge expected the trial to continue with Meldon representing the respondent in Wagner's absence. The judge knew that Meldon was an attorney of record who had represented the respondent from the outset of the case. It was not until after Wagner was excluded that the trial judge learned that the respondent would not permit Meldon to represent him.

respondent's constitutional right not to be twice put in jeopardy. Accordingly, the judgment before us is reversed, and the case is remanded to the Court of Appeals for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. CHIEF JUSTICE BURGER, concurring.

I concur fully with MR. JUSTICE STEWART's opinion for the Court. I add an observation only to emphasize what is plainly implicit in the opinion, *i. e.*, a trial judge's plenary control of the conduct of counsel particularly in relation to addressing the jury.

An opening statement has a narrow purpose and scope. It is to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole; it is not an occasion for argument. To make statements which will not or cannot be supported by proof is, if it relates to significant elements of the case, professional misconduct. Moreover, it is fundamentally unfair to an opposing party to allow an attorney, with the standing and prestige inherent in being an officer of the court, to present to the jury statements not susceptible of proof but intended to influence the jury in reaching a verdict.

A trial judge is under a duty, in order to protect the integrity of the trial, to take prompt and affirmative action to stop such professional misconduct. Here the misconduct of the attorney, Wagner, was not only unprofessional *per se* but contemptuous in that he defied the court's explicit order.

Far from "overreacting" to the misconduct of Wagner,

in my view, the trial judge exercised great restraint in not citing Wagner for contempt then and there.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL concurs, dissenting.

The Court's premise is that the mistrial was directed at respondent's request or with his consent. I agree with the Court of Appeals that, for purposes of double jeopardy analysis, it was not, but rather that "the trial judge's response to the conduct of defense counsel deprived Dinitz's motion for a mistrial of its necessary consensual character." 492 F. 2d 53, 59 n. 9 (1974). Therefore the rule that "a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution," United States v. Jorn, 400 U. S. 470, 485 (1971) (plurality opinion), is inapplicable. Accordingly, I agree that respondent's motion, for the reasons expressed in the panel and en banc opinions of the Court of Appeals, did not remove the bar of double jeopardy to reprosecution in "the extraordinary circumstances of the present case, in which judicial error alone, rather than [respondent's] exercise of any option to stop or go forward, took away his 'valued right to have his trial completed by a particular tribunal.'" 504 F. 2d 854–855 (1974). I also agree with the holding in the panel opinion that "[i]n view of . . . [the] alternatives which would not affect the ability to continue the trial, we cannot say that there was manifest necessity for the trial judge's actions." 492 F. 2d., at 61. I would affirm.

---

*A bar association conscious of its public obligations would *sua sponte* call to account an attorney guilty of the misconduct shown here. See Report of American Bar Association Special Committee on Evaluation of Disciplinary Enforcement, Problems and Recommendations in Disciplinary Enforcement 60–66 (Final Draft 1970); American Bar Association Project on Standards for Criminal Justice, Administration of Criminal Justice—The Defense Function, § 7.4, p. 131 (1974 Compilation).