Gene A. BRAXTON, Appellant,

v.

UNITED STATES, Appellee.

Calvin L. BRAXTON, Appellant,

v.

UNITED STATES, Appellee.

Darnell L. WASHINGTON, Appellant,

v.

UNITED STATES, Appellee.

Nos. 12412, 12415 and 12481.

District of Columbia Court of Appeals.

Argued April 11, 1978.

Decided Oct. 25, 1978.

Kenneth M. Trombly, Washington, D. C., appointed by this court, for appellant Calvin L. Braxton.

Robert Case Liotta, Washington, D. C., appointed by this court, for appellant Eugene A. Braxton.

O. B. Parker, Washington, D. C., appointed by this court, for appellant Darnell L. Washington.

Henry F. Greene, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and John P. Hume, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before NEWMAN, Chief Judge, and NEBEKER and MACK, Associate Judges.

NEBEKER, Associate Judge:

Appellants were charged with murder in the second degree while armed. D.C.Code 1973, §§ 22–2403, –3202. During the course of their four-day trial by jury, the trial judge declared a mistrial as to each appellant. Their cases were reassigned to another judge for re-trial, and their several motions for dismissal upon double jeopardy grounds were denied. Those denials are the subjects of these appeals. The issues presented are whether the mistrials were declared upon the request or acquiescence of appellants and, if not, whether there existed a manifest necessity for the declarations. We conclude that neither justification existed and that, therefore, the indictment must be dismissed.

Because our holding will necessarily be limited to the specific occurrences revealed in this case and because we desire to avoid editorial characterization, we burden this opinion with extensive quotations from the record.

I

Appellants were each charged in the death of James Marshman. The government's evidence tended to show that appellant Gene Braxton, who was on crutches at the time, became engaged in an argument with Marshman outside a bar. Marshman pushed Gene Braxton, whereupon Gene Braxton pulled a knife and cut Marshman about the face and neck. Appellant Calvin Braxton and appellant Washington joined the fray. Calvin Braxton broke a walking cane across Marshman's head, and Washington thrust a screwdriver through Marshman's breastbone. Marshman died as a result of the knife and screwdriver wounds.

Calvin Braxton presented no defense.[1] Both Gene Braxton and Washington testified in their own defenses on the third day of trial. During Washington's self-defense testimony he necessarily admitted that he stabbed the victim with the screwdriver. The following day, during cross-examination by the prosecutor, Washington was asked:

Q. When is the first time you ever told anyone you struck that man with the screwdriver?

A. The first time I told anyone? It was Patricia Brooks [a government witness], I told her that the screwdriver that she handed me, she asked me did I stab him with it, I told her yes.

Q. What was the next time you even told anyone about that, sir? You never told anyone until you got on the stand yesterday, is that right, sir?

A. On the stand yesterday—that's right.

\* \* \* \* \* \*

---

1. His motion for judgment of acquittal, based upon the absence of evidence that the blow with the cane was a direct cause of Marshman's death, was properly denied since he was charged as an aider and abettor in the murder.

Q. Isn't it correct, sir, that [at] none of those times [prior conversations about this case] did you ever tell the police, myself, your lawyer, anyone, that you struck this man with a screwdriver, isn't that true?

A. No one but Patricia.

No objection was made to the prosecutor's reference to conversations between Washington and his attorney or to the attempted impeachment by prior silence. On redirect, Washington's attorney asked:

Q. Do you recall [the prosecutor] talking to you just a minute ago and asking you the question, when was the first time you told—you have indicated you struck the man with a screwdriver, is that correct?

A. Yes, sir.

Q. Is this the first time—

THE COURT: Excuse me, send the jury out, please.

During the ensuing bench conference, Washington's attorney, Mr. Parker, proffered the following line of questioning:

[T]he only question I'm asking is, when is the first time you [Washington] heard that the man had died from a stab wound and, secondly, had he ever told me about it, and why he had never told me about it.

THE COURT: The better approach is that he told you, his lawyer, that he did this to him.

MR. ABRAMS [the prosecutor]: He didn't try—

THE COURT: Mr. Parker says he did.

MR. ABRAMS: I don't think Mr. Parker said that. Mr. Parker had—testify [sic] he'd say he never heard that version, he heard a different version.

THE COURT: You [Mr. Parker] are suborning perjury in this courtroom. If he told you something else and you put him on the stand, you should have notified me immediately, and you should have —first, has to get out of it [apparently, the trial], because—or alternatively stay in it, but let him tell his story without putting him on here and charging him as though he was a credible witness.

\* \* \* \* \* \*

Did he ever tell you at all, the same story that he has told on that stand?

\* \* \* \* \* \*

Did he tell you essentially the same thing? Because if he told you something different, you have perjury.

\* \* \* \* \* \*

MR. PARKER: He indicated to me at the table, if Your Honor please, that he had used the screwdriver. That was before he took the stand.

THE COURT: Mr. Parker, I would suggest, in the future, you consult the canon of ethics because, in effect, what you are doing, you are waiting until the last minute, laying back and picking his best story and putting him up on the stand. You are allowing perjury in the case.

\* \* \* \* \* \*

MR. PARKER: He indicated [this] to me just a few minutes before he took the stand.

THE COURT: Then you're suborning perjury.

MR. PARKER: No, he indicated to me when he took the stand, he was going to tell the truth.

THE COURT: You should have claimed surprise and come to me. You can't continue to examine a man who told you one story and when you put him forward as a credibility witness, he tells a separate story—

\* \* \* \* \* \*

I don't know whether you're all requesting this trial, whether mistrials are in order and if not in order how to guide you the rest of the way.

No motion for a mistrial had been made at this point. After further colloquy of this nature, the trial judge ruled on the consequences of the alleged subornation of perjury:

You [Mr. Parker] cannot argue anything [to the jury] as far as his testimony, because you don't know what the heck the truth is.

\* \* \* \* \* \*

Alternatively, unless all of you are asking for mistrials—

Gene Braxton's attorney thereupon requested a mistrial because Washington had "testified extensively with regard to what the other defendants did." The court denied the motion, stating that "You can argue his testimony to the jury," and directed that further discussion be off the record. Upon returning to the record, Washington's attorney declined to request a mistrial: "I don't think I have done anything wrong. I'm not asking for a mistrial at this time." The court again directed that discussion be off the record. Upon return to the record, Calvin Braxton's attorney declined to request a mistrial, but Washington's attorney requested that he be excused from the case "based upon what Your Honor has said." That request was denied:

I will not let you rescue or step out of this case. . . . [B]ut I admonish you sir, to make no comment in your summation to anything that your client has said, and that's pursuant to the canons, sir.

When the jury was brought back, Washington's attorney rested his case.

The government, in its case in rebuttal, produced a police officer who testified concerning certain statements made by Washington while in custody which varied from Washington's trial testimony. Many of the statements allegedly made by Washington concerned the participation of his codefendants in the alleged murder. The jury was instructed that the officer's testimony could be considered only in impeachment of Washington and not as probative of the participation of Washington's codefendants in the alleged murder. Counsel for Gene Braxton, however, requested a mistrial because some of the statements attributed to Washington purported to quote Gene Braxton as making the inflammatory statement, "I took care of that nigger." The court ruled that the jury had been properly instructed.

During closing argument, the prosecutor referred to Washington's alleged extra-trial statements. Counsel for both Gene and Calvin Braxton moved for a mistrial on the grounds that the prosecutor argued the substantively probative value of these statements rather than their impeachment value. Neither motion was granted.

Counsel for Calvin Braxton made his closing argument to the jury which was not transcribed.

Counsel for Gene Braxton (Mr. Liotta) next argued his case to the jury. In the course of that argument, he referred by name to the lesser included offenses to murder in the second degree while armed and stated, "I will state to you part of what His Honor's instructions will be about, just so you can get an idea how the facts fit in." Immediately following this statement the following colloquy occurred:

THE COURT: Sustain the objection, it's improper—merely highlight the fact that I will give it to them is sufficient, Mr. Liotta.

MR. LIOTTA: But Your Honor, I don't think I will infringe upon Your Honor's ground at all.

THE COURT: All right, let's continue.

When Mr. Liotta stated that the court would instruct the jury that the government must prove that his client "inflicted an injury on the deceased from which the deceased died" the court responded: "That's improper under the aiding and abetting instruction; that's improper. Don't go into the instructions. Don't debate with me, please; it's too warm. Proceed." Mr. Liotta then argued that the government must prove malice. The court again cautioned counsel not to refer to the jury instructions. Mr. Liotta's request to approach the bench was denied, and he continued his argument without reference to the law. During part of that argument he ended an incomplete sentence with, "—it's a little difficult to do it this way," and the following occurred:

THE COURT: Excuse me, is that a comment to the court or to yourself?

MR. LIOTTA: It's a little difficult for me to do this.

THE COURT: Don't make comments to yourself, just make your argument to the jury, sir.

MR. LIOTTA: Your Honor, may I very briefly explain what the theory of aiding

and abetting is? The Government went into it.

THE COURT: —did not. That's why Mr. Parker objected [during the prosecutor's argument]. He merely—

MR. LIOTTA: Your Honor said he could allude to it very briefly.

THE COURT: Mr. Marshall, take the jury out, please.

When the jury had been removed, the court reiterated its ruling that counsel was not to refer to the law in argument to the jury. The court also criticized counsel for his demeanor during the course of the trial:

But more importantly, Mr. Liotta, for the past three days, you have demonstrated a contemptuous attitude for this Court. I have not said anything to you, except that it has caused me to give [you] legal reasoning [for] why I ruled certain ways to this jury, and after I rule, you continue to argue.

You continue to argue, and argue and argue, and then you demonstrate to the jury as though I'm wrong, that I have done something foul against you, sir. I take umbrage to that, sir. I really do, Mr. Liotta, because you continued to argue with this Court repeatedly, time after time, after a ruling has been made.

\* \* \* \* \* \*

When counsel asked, "Can I say something, Your Honor?" the court's response was: "No, sir, because I don't know what you're going to say. I have made a ruling." The court then stood in recess.

When court reconvened, the court stated its intention to declare mistrials as follows:

THE COURT: Bring in the defendants, please. Mr. Trombly [counsel for Calvin Braxton], you asked for a mistrial at the bench here, is that correct?

MR. TROMBLY: Yes, sir.

THE COURT: Granted. You asked for a mistrial too, Mr. Liotta [counsel for Gene Braxton]?

MR. LIOTTA: Yes, I did.

THE COURT: I will grant it. Mr. Parker [counsel for Washington], in view of the nature of your position, you have asked for one, you can no longer represent this man on the principles of law as an attorney—I grant it.

The court then stated its reasons for the mistrials:

because you have exhausted my patience and I am tired of trying to maintain a proper atmosphere so that a fair trial can occur in this case . . . [and of] being challenged before the jury by you, Mr. Liotta, by you, Mr. Parker, concerning my rulings[;]

[because] on several occasions, it had been intimated before the jury, that the Court somehow prevented counsel from asking certain questions when the Court had only ruled according to proper legal procedure[;]

[because] this has been nothing more than a moot court class in any law school; a judge is not a proper instructor[;]

[because] I believe that the defendants in this case deserve competent counsel, and unfortunately, in this case they did not receive competent counsel[;]

[because] the unfortunate circumstances of Mr. Parker's client have further detracted from the fairness of this proceeding[;]

[because] when you weigh [the length of the trial] against the fact that if they are convicted the possibilities are that they can go to jail for twenty years to life . . ., I must grant the mistrial in all fairness to them.

The court further stated that it would certify the case to the Chief Judge of the Superior Court "in view of the fact that . . [Washington] made two statements; one to his attorney before trial, one during the trial, and then a different one on the stand." In order to ensure "that [the defendants] have competent counsel, I am removing all three of you as counsel in this case." When Calvin Braxton's counsel attempted to speak, the court refused to hear him:

It doesn't call for a comment, sir, it does not, and I suggest that I am ashamed of the three of you, the way you conducted yourselves. You didn't try this

case, you tried the prosecutor and you tried this Court's patience. If you tried my patience, you have succeeded . . . .

After the jury had been discharged, the court informed counsel for Gene Braxton and Washington that they would be stricken as counsel should they again appear on the trial judge's "felony one" calendar. Counsel for Calvin Braxton was not so warned because he had been "the least offensive."

## II

These cases were reassigned the next day to another judge for trial. Appellants were again represented by their original counsel.[2] The jurors empaneled in the first trial were recalled and a voir dire conducted in an attempt to re-empanel the jury. That attempt was abandoned when the government sought a writ of prohibition in this court.

Appellants moved to dismiss the indictments on double jeopardy grounds. The court, after hearing argument and reviewing the record, held that although there had been no manifest necessity for the declarations of mistrial, the mistrials were granted pursuant to the requests and acquiescence of appellants' counsel. The court denied the motions for dismissal, and appellants prosecuted these appeals. *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977) (such denial is immediately appealable).

■ The parties are agreed that the issues before this court are, first whether the mistrials were declared pursuant to appellants' requests or acquiescence and, second,

if not, whether there existed a manifest necessity for the mistrials. Our review of the trial record[3] persuades us that neither justification for the mistrials existed and that, therefore, retrial is barred.

## III

■ "[A] motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error," unless the circumstances necessitating the mistrial were "attributable to prosecutorial or judicial overreaching." *United States v. Jorn,* 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971) (plurality opinion) (footnote omitted), *quoted with approval in United States v. Dinitz,* 424 U.S. 600, 607, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976). *See United States v. Tateo,* 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964).

In the instant cases, counsel for Gene Braxton and Calvin Braxton each requested a mistrial at the conclusion of the prosecutor's opening summation to the jury. Counsel for Gene Braxton had, in addition, requested a mistrial based upon Washington's allegedly perjured testimony and upon the admission of the allegedly inflammatory statement attributed to Gene Braxton. Counsel for Washington did not, in so many words, request a mistrial. He did, however, request that he be removed from the case, a request which, if granted might have necessitated declaration of a mistrial. *Cf. United States v. Dinitz, supra,* (request for mistrial after removal of counsel removed bar to retrial). None of these motions were granted when made, nor did the trial judge

2. Mr. Trombly asserted before the second trial judge and on appeal that the first trial judge had, sua sponte, reappointed him as counsel for Calvin Braxton. The record does not, however, reflect when or by whom that reappointment was made.

3. The decision to deny appellants' motions to dismiss was based upon the trial record (including transcript) and the arguments of counsel. No evidentiary hearing was held in which

facts outside the trial record were found. (We express no opinion upon the propriety or usefulness of such an evidentiary hearing, in these circumstances.) Our review of the denial of appellant's motions to dismiss, therefore, is upon a question of law, not one of fact. *See, e. g., United States v. Goldstein,* 479 F.2d 1061, 1066 n.9 (2d Cir.), *cert. denied,* 414 U.S. 873, 94 S.Ct. 151, 38 L.Ed.2d 113 (1973); 5A J. Moore, Federal Practice, para. 52.04 (2d ed. 1971).

indicate that he would reserve ruling or reconsider his ruling later in trial.[4]

The government argues that these motions, although denied when made, were still before the court when the mistrials were declared, citing *Lee v. United States,* 432 U.S. 23, 97 S.Ct. 2141, 53 L.Ed.2d 80 (1977). In *Lee,* the trial judge in a bench trial had denied the defendant's motion to dismiss made following the prosecutor's opening statement—*i. e.,* before jeopardy had attached[5]—but stated that he would reconsider his ruling after he had had an opportunity to research the issue involved. *Id.* at 26, 97 S.Ct. 2141. Defense counsel did not object either when, at the close of the government's case in chief, the trial judge reminded counsel that the earlier motion to dismiss (as well as counsel's then-current motion for judgment of acquittal) was still under active consideration or when the motion was granted. *Id.* at 26, 33–34, 97 S.Ct. 2141. The motion was granted for the reasons advanced by counsel when the motion was made. The Court concluded that, under these circumstances, "the proceedings were terminated at the defendant's request and with his consent." *Id.* at 33, 97 S.Ct. at 2147.

*Lee* is analogous to the instant case in that the motion for dismissal in *Lee* was the functional equivalent of a motion for mistrial in that neither motion contemplated termination of the proceedings "in the defendant's favor." *Id.* at 30, 97 S.Ct. 2141, *quoting United States v. Jenkins,* 420 U.S. 358, 365 n.7, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975). And in *Lee,* as in these cases, the motion made was granted only after the intervention of other trial proceedings.

Here, however, the similarities end. None of the motions in this case were specifically reserved or left open for reconsideration. Appellants had no notice that the trial court might declare mistrials. When the court recessed, immediately prior to the declarations of mistrial, there had been no indication that the recess was for the purpose of considering mistrials. When the court reconvened, the trial court precipitously asked whether counsel for the Braxtons had "asked for a mistrial" not whether that request was still effective. The failure of counsel to object to the declarations of mistrial cannot, in the circumstances of the trial, be attributed to consent or acquiescence. Counsel had been repeatedly admonished not to "argue" with the court after a ruling had been made or to require the court to "give legal reasoning [for] why I ruled certain ways." Although counsel for Calvin Braxton did attempt to speak before the jury was discharged, he was advised that the rulings required no comment. Lack of objection in these unique circumstances must be attributed to lack of opportunity for objection rather than acquiescence.

Nor were the reasons for which the mistrials were declared the reasons advanced by counsel in their earlier motions. None of the reasons advanced by the trial court were even arguably related to the grounds advanced by counsel for Gene and Calvin Braxton in their motions. In purporting to grant the mistrial which might have been necessitated by a grant of Washington's counsel's request to withdraw, the court stated as grounds for the mistrial its opinion that "you can no longer represent this man on the principles of law as an attorney . . . ." Washington's counsel had specifically declined to request mistrial until after the court had twice directed that discussion be off the record. Only then did counsel request that he be excused from the case, "based upon what Your Honor has said." We will not speculate as to what was said off the record, and we will not assume that Washington's counsel was persuaded, contrary to his opinions on the record, that he had violated the canons of

---

4. Each of the motions was specifically denied with the exception of Gene Braxton's motion upon the introduction of the allegedly inflammatory statement attributed to him. The record leaves no doubt that this last motion was, in effect, denied when the trial judge ruled that the jury had been properly instructed.

5. *Serfass v. United States,* 420 U.S. 377, 388, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975).

ethics or suborned perjury. The opinion that Washington's counsel was unable to represent his client "on the principles of law" was the trial judge's only, and not the grounds for counsel's request.[6]

■ We pause here to admonish that the authority of Superior Court judges over court reporters (D.C. Code 1973, § 11–1727(a)) does not include authority to direct that proceedings relating to cases be "off the record." The Superior Court is a court of record, D.C. Code 1973, § 11–901, and as such all proceedings in cases before it must be "on the record." *See also* District of Columbia Court, Court Reporter Rules, Rule 4(1) ("The reporter shall record verbatim . . . . : (1) [a]ll proceedings in cases held in open court"). No directions to the contrary shall be given or followed.

That *Lee* is distinguishable is not conclusive, of course, unless the features that distinguish *Lee* from the instant cases substantially affect the interests of appellants cognizable under the double jeopardy clause. We need not decide whether each of these features—lack of opportunity to object and the declaration of mistrials for reasons other than those upon which the requests were made—would be sufficient for us to conclude that the declarations were sua sponte. In the circumstances of this case, the two factors in combination lead us to so conclude.

■ That a mistrial declared upon the request of the defendant does not ordinarily preclude retrial is simply the corollary of the defendant's right to retain "primary control over the course to be followed in the event of [prosecutorial or judicial] error." *United States v. Dinitz, supra,* 424 U.S. at 609, 96 S.Ct. at 1080. Whether retrial is barred, therefore, depends not only upon whether the declaration of mistrial followed a request by the defendant for a mistrial but whether the mistrial was declared in a manner and under circumstances which ful-

ly recognize the right of the defendant to retain that primary control. Thus, for example, a defendant may request a mistrial because of circumstances intentionally created by the judge or prosecutor in order to provoke a mistrial request. The request, in such circumstances, is not an exercise of control by the defendant but a recognition that the defendant has already lost his primary control through the bad faith of a governmental actor, and retrial is barred even though, in a formalistic sense, the mistrial was granted at the defendant's instance. *Id.* at 611, 96 S.Ct. 1075; *United States v. Scott,* 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978).[7]

■ It would be appealingly simple to say that, once a defendant has exercised his right to control the course of proceedings following error by waiving his "valued right to have his trial completed by a particular tribunal," *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949), he suffers no harm by the later dismissal of that tribunal. Such an approach, however, assumes that an attempted waiver of the right to completion of the trial waives the primary right which made that attempted waiver possible—the right to control the course of proceedings following error. Where the request for mistrial is granted and the mistrial declared, this is practically true, for there will remain no options over which the defendant might exert control. But where the request for mistrial is not granted and the trial proceedings resume, the defendant is again entitled to resume control over the course of those proceedings, a control which would be meaningless if subject to defeasance through a purported grant of a request made prior to the resumption of control.

Were the defendant, upon denial of his mistrial motion, not reinvested with his right to proceed to verdict, moreover, con-

---

6. *See* also note 14 *infra.*

7. In *Scott,* as in *Lee,* the accused's motion to dismiss was granted for the same reasons upon which the motion had been predicated. That motion, moreover, although made prior to trial

and denied, "was renewed [at the close of evidence] and it was *then* granted by the district court . . . ." 544 F.2d at 903, (6 Cir.) (opinion of the Court of Appeals) (emphasis added).

trol over the course of further proceedings would necessarily devolve upon the trial judge and the prosecutor. A decision to abort the proceedings at some later stage, however motivated, would be wholly unreviewable, for the defendant's earlier motion would have waived all of his rights. The potential for abuse is obvious. And where the trial judge's reasons for a later declaration of mistrial are not those earlier urged by the defendant, the potential for abuse would be unmitigated even by the presumed integrity of the trial judge.

In the instant cases, appellants did not have an opportunity to address the trial court or to object to its proposed declarations of mistrial. These circumstances suggest a total disregard for the control over the course of the proceedings regained by appellants when their earlier motions had been denied. And what is suggested by these circumstances is made abundantly clear by the reasons announced by the court in declaring the mistrials, for those reasons were not the reasons urged in appellants' earlier attempt to exercise control.

The government argues, however, that this disregard for the right to control the course of proceedings following error is, in effect, harmless where, as (it asserts) here, the course of proceedings between denial of the defense motions and declaration of the mistrial does not suggest that the declaration of mistrial might have been motivated in part by a decline in the government's trial position. The three cases cited by the government which lend some support to this argument,[8] however, are factually very different from the instant cases. In *People v. Bowman*, 36 Mich.App. 502, 194 N.W.2d 36 (1972), the defendant had moved for a mistrial in chambers. The court at first denied the motion but then reversed its decision, all while still in chambers. In *Napoli v. Supreme Court*, 40 App.Div.2d 159, 338 N.Y.S.2d 721 (1972), the defendant in a bench trial moved for a mistrial on the grounds that the prosecutor had withheld exculpatory material. The trial court reserved ruling but ordered the prosecutor to produce the material. During the course of various proceedings pursuant to that order, but before trial had recommenced, the court, over defense objection, declared a mistrial upon the grounds urged by the defendant. Similarly, in *United States v. Pappas*, 445 F.2d 1194 (3d Cir. 1971), it does not appear that any trial proceedings were conducted between the defense motion, at the close of the government's case in chief, and the grant of the motion, upon the same grounds, the following day.

Thus, while each of these cases is susceptible of a reading that the defense was not hindered nor the prosecution benefited by the lapse of time between the motion and the declaration, each is equally susceptible of a reading that there had been no further proceedings—regardless of which party might have benefited from such proceedings—to which the defendant's right of control attached. In the instant cases, on the other hand, there were considerable proceedings before the jury between the requests for mistrials and the purported grants.[9]

■ Moreover, a review of such interim proceedings by this court would be an unwarranted assumption of a right which is

---

8. Three other cases cited by the government as support for this argument are inapposite since in each the appellate court held that the mistrial was granted upon the implicit or explicit acquiescence of the defendant and upon the same grounds earlier urged by the defendant. *United States v. Goldstein, supra* note 3 (also held, manifest necessity); *MacPherson v. State*, 533 P.2d 1103, 1106 (Alaska 1975); *Kamen v. Gray*, 169 Kan. 664, 220 P.2d 160 (1950). A fourth case, *Parr v. State*, 117 Ga.App. 484, 160 S.E.2d 865 (1968), while appearing by its facts to support the government's argument is wholly devoid of any rationale even remotely attrib-

utable to an analysis of the double jeopardy claim.

9. Although distinguishing the cases cited by the government on this ground, we do not hold that the recommencement of trial proceedings is a prerequisite to a plea of former jeopardy in such situations. *See Cardenas v. Superior Court*, 56 Cal.2d 273, 14 Cal.Rptr. 657, 363 P.2d 889 (1961); *Maes v. District Court*, 180 Colo. 169, 503 P.2d 621, 625 (1972); *Commonwealth v. Robson*, 461 Pa. 615, 620–21, 337 A.2d 573, 575–76 (1975).

peculiarly the defendant's. It is his evaluation of the course of the trial, not ours, which must inform any waiver of the "valued right to have his trial completed by a particular tribunal." *Wade v. Hunter, supra,* 336 U.S. at 689, 69 S.Ct. at 837. An earlier request for a mistrial may, with the mere passage of time, be considered as having been improvidently made and fortunately denied. Evidence which to us might seem to bolster the government's case might be viewed by the defense (rationally or not) as the sort of "overkill" which may produce jury sympathy. And the reaction of the jury to a prolonged bench conference, weekend recess, or even argument of counsel will never, absent a verdict, appear from the record as it might appear on the faces of the jurors.

In the circumstances of these cases, we cannot say that the mistrials were declared in response to or made harmless by appellant's earlier motions. We therefore consider whether the mistrials were declared for manifest necessity.

### IV

■ A mistrial without bar to retrial may be declared without the consent of the defendant or even over his objection if there exists a "manifest necessity" for the declaration. *United States v. Perez,* 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824). This classic formulation of the circumstances which justify a mistrial does not require demonstration of absolute necessity but of that "high degree" of necessity, *Arizona v. Washington,* 434 U.S. 497, 98 S.Ct. 824, 831, 54 L.Ed.2d 717 (1978), which, in the context of "the varying and often unique situations arising during the course of a criminal trial," *Illinois v. Somerville,* 410 U.S. 458, 462, 93 S.Ct. 1066, 1069, 35 L.Ed.2d 425 (1973), is sufficient to override the defendant's interest in "having his fate determined by the jury." *Id.* at 471, 93 S.Ct. at 1073.

■ Whether this interest is overborne by particular circumstances must be re-

solved, in the first instance, by the trial judge. But "[i]n order to ensure that this interest is adequately protected, reviewing courts have an obligation to satisfy themselves that, in the words of Mr. Justice Story [in *Perez*], the trial judge exercised 'sound discretion' in declaring a mistrial." *Arizona v. Washington, supra,* 98 S.Ct. at 835. The exercise of this sound discretion does not require that the court find, in so many words, that there was a "manifest necessity" for the declaration, *id.* at 836, but rather that "the basis for the trial judge's mistrial order [be] adequately disclosed by the record." *Id.*

■ In the instant cases, the trial judge spread upon the record the bases for the mistrials.[10] These bases, which are fully quoted above, may be summarized as follows: appellants had not received the effective assistance of counsel; the behavior of counsel before the jury prevented a fair trial; appellant Washington's "unfortunate circumstances . . . further detracted from the fairness of [the] proceeding"; and counsel had "exhausted [the] patience" of the trial judge, who was "tired of trying to maintain a proper atmosphere" for a fair trial. Were our review limited to the trial judge's stated reasons for declaring the mistrials, we might be compelled to conclude that there was "manifest necessity." *See, e. g., Arizona v. Washington, supra* (manifest necessity engendered by defense counsel misconduct affecting fairness of trial); *Wright v. United States,* D.C.App., 365 A.2d 365 (1976) (manifest necessity engendered by ineffective assistance of counsel). But our review is not of the trial judge's stated reasons, however elaborated, for those reasons are but conclusions drawn from the events at trial; rather our review must proceed from the events at trial, and our enquiry is whether those events, coupled with the deference owed the trial judge as an experienced observer of such events, support a conclusion that the mistrials were declared for reasons of manifest necessity. *Arizona v. Washington, supra.*

10. Among these bases we do not include the bases asserted by counsel in their earlier requests for mistrial, for although the court purported to grant those motions, the record is clear that the court did not reconsider the grounds earlier urged upon it.

 The record of this four-day trial reveals what can only be characterized as an escalating antagonism between defense counsel, primarily Mr. Liotta, and the trial judge. Whether this antagonism might have had its roots in events prior to this trial we cannot know, but the exasperation of the trial judge at what he considered to be trial counsel's incompetence developed quite rapidly on the second day of trial, the first before the jury. After a series of successful prosecution objections to Mr. Liotta's questions on cross-examination (mainly for lack of an evidentiary predicate), the trial judge sternly admonished Mr. Liotta that the court would not tolerate the improper phrasing of questions. Thereafter, the exchanges between Mr. Liotta and the trial judge were frequent and, ap-

parently, quite heated, as a few of the many examples of their colloquy will attest.[11] The record reveals no criticism by the trial court of Mr. Trombly's demeanor, ability, or performance. But Mr. Parker was frequently criticized for wasting the trial judge's and the jury's time by asking to approach the bench or by cross-examining government witnesses about areas which had already been explored in cross-examination by Mr. Liotta and Mr. Trombly.

The fruit of three days of the trial judge's attempts to compensate for and correct the apparent artlessness of defense counsel's advocacy was, as the trial judge noted, the exhaustion of his patience. His objections to the questions of defense counsel frequently bordered on the trivial;[12] he

11. A witness had testified that he had given an oral statement to the prosecutor, who had been writing throughout the interview:

MR. LIOTTA: If there's a statement, I'd like to see it.
THE COURT: There's never been a statement.
MR. ABRAMS: I don't have any notes.
MR. LIOTTA: I accept that. If there's no notes, there's no notes.
THE COURT: It doesn't call for commentary, sir, it calls for questions and answers.

During cross-examination of another witness the following occurred:

THE COURT: That·[line of questioning] opens the door on rebuttal to bring out everything else.
MR. LIOTTA: We are expecting that.
THE COURT: Go right ahead, be my guest.
MR. LIOTTA: We thought about the consequences.
THE COURT: When you put the robe on, then you can call a halt to the talk. Until then,·I call a halt to the talk. Get down and continue with your case.

Upon Mr. Liotta's request (after the jurors had left the courtroom) that certain government witnesses be held for recall by the defense the following occurred:

THE COURT: May I ask for a proffer?
MR. LIOTTA: Yes, Your Honor. We tried to ask questions with regard to what Technician—
THE COURT: No, no, you make it sound, Mr. Liotta, as though you carry a chip on your shoulder from the way you walk into a courtroom until the moment you leave. By stating to this Court, we tried to ask questions, you imply that I deliberately tried to block your examination, and any first year law student would know that any person

who presides in a case has a right to limit the cross-examination, and I take offense to the contemptible statement that you have constantly made through the course of this trial, implying that I am impeding your progress.

A government witness had identified morgue photographs of the deceased:

MR. LIOTTA: I'd appreciate it if Mr. Abrams would keep pictures covered until they are admitted.
THE COURT: I still run this Court. These comments are not worthy of being stated in front of the jury. You have accomplished what you should not have accomplished.
MR. LIOTTA: I noticed them in open view—
THE COURT: I was watching all the time, and at no time were they flashed in front of the jury. Don't remind me of my job. Don't argue with me.

12. Two examples suffice.

Q. [by Mr. Liotta] [B]efore you [the medical examiner] made your analysis in Court, had you ever learned what supposedly happened to this man [the deceased]?
THE COURT: He made it at the morgue.
MR. LIOTTA: He expressed his opinion in Court.
THE COURT: You made it seem as though he just made his analysis.

And during cross-examination by Mr. Parker of a government witness:

Q. Mr. Brown, you heard from Mr. Abraham, he asked you—
THE COURT: No, it's Abrams. Abraham, I believe, was the father of—
MR. PARKER: I'm sorry.
THE COURT: He's the preacher in front of me. It was Abraham who had a couple of kids named Issac, and a few other of the boys.

often undertook to examine witnesses himself in an apparent effort to instruct counsel on the proper manner of examination; [13] and his rulings became somewhat questionable.[14] His exhaustion, more than any other factor, appears to have produced the ruling that Mr. Parker not be allowed to argue his client's case to the jury, for the record is barren of any hint that Washington had perjured himself or that Mr. Parker had suborned perjury.[15] And this exhaustion, more than any other factor, appears to be the motivating factor for the declarations of mistrials.

While Mr. Liotta's examination of witnesses, summation to the jury, and general trial demeanor revealed shortcomings, and while Mr. Parker's questions were often repetitive of questions asked by other defense counsel, none of the three defense counsel appears to have been anything but well-prepared and zealous in the defense of his client. We cannot but agree with the post-trial hearing judge's assessment of the record that "all participants [at trial were] very vigorously, very alertly, and very actively engaged in discharging their respective duties and functions."

To the extent that trial counsel's failings may have contributed to a courtroom atmosphere lacking in the decorum conducive to sound judgment by a fair and impartial jury, the record lends some support to the conclusion of the trial judge that appellants might have been denied a fair trial.[16] Given this possibility, great deference ordinarily would be owed the judgment of the trial judge in assessing the actual impact of these trial events upon the impartiality of the jurors. *Arizona v. Washington, supra,* 98 S.Ct. at 833. But the rationale for such deference to the trial judge's judgment must fail where the record reveals that the trial judge "failed to exercise the 'sound discretion' entrusted to him" (*id.,* 98 S.Ct. at 833 n. 28); that that discretion was improperly influenced by factors extraneous to both the rights of the accused and the public interest in just adjudication (*see United States v. Bristol,* D.C. App., 325 A.2d 183 (1976) (declaration of mistrial for unspecified "personal reasons" of trial judge) and *United States v. Gordy,* 526 F.2d 631 (5th Cir. 1976) (deliberating jury dismissed for judge's personal conve-

13. At one point the trial judge undertook, during cross-examination of a government witness, to impeach the witness with a prior inconsistent statement—a route the defense attorney had specifically eschewed.

14. For example, during cross-examination of a government witness, Mr. Trombly attempted to impeach the witness by a prior inconsistent statement:

Q. When you spoke to the police October 10, 1975, and you told them that Darnell [Washington]—

THE COURT: Excuse me, you only represent one defendant, Mr. Trombly. Don't interfere with Mr. Parker's case unless you're giving him permission, Mr. Parker.

MR. PARKER: I don't have any objection.

\* \* \* \* \* \*

THE COURT: I sustain the objection. [None appears of record.] The government may raise that's improper; you represent one man, and one man only. You can go into the bias and prejudice. I suggest you not exceed the bounds of representing your client, sir.

Other instances include (by way of example, not limitation) admitting into evidence and distributing to the jurors (over objection) government exhibits before allowing cross-examination of the identification witness; and exclud-

ing competent testimony as to the size and weight of the victim on the ground that the medical examiner's evidence would be less "speculative."

15. All the government's evidence, both pretrial (in bail hearings) and at trial, tended to show that Washington had stabbed the deceased with a screwdriver. The only surprise in Washington's testimony, therefore, was his admission, coupled with a defense of self-defense. Had Washington admitted to his attorney his involvement in the murder prior to trial and then proceeded to deny it on the witness stand, the trial judge as well as the attorney would have been presented with a much different and more difficult situation. But Washington's failure to admit to the full extent of his involvement in the homicide until the government had been put to its proof presented neither ethical conflict for his attorney nor occasion for the imposition of sanctions by the trial judge.

16. The trial judge did not (and the government does not now) suggest that the jury may have been prejudiced against the government's case. Considering nevertheless this potential ground for support of the trial judge's ruling, we find it to be without support in the record.

nience)); or that the trial judge's conduct of the trial was such as to compel a conclusion that his sound discretion had left him (*see United States v. Jorn, supra* ).

■ Our reading of the entire record of this trial leads us to conclude that our review of the propriety of the declarations of mistrial must be fully independent of the great deference normally owed the judgment of the trial judge. A trial judge's proper role in the conduct of a jury trial is, as this trial judge found it frequently necessary to advise the jury, that of "umpire." Should it become necessary during the course of trial to censure or discipline counsel or other participants in the trial, the role of disciplinarian must often, of necessity, be assumed by the trial judge. But the two roles cannot be permitted to become confused with the result that the role of disciplinarian affects either the performance of the trial judge's primary role or the fairness of the trial itself. *See A.B.A. Project on Standards for Criminal Justice, The Function of the Trial Judge,* §§ 6.3, 6.4 (Approved Draft 1972). *Cf. Sacher v. United States,* 343 U.S. 1, 8, 72 S.Ct. 451, 454, 96 L.Ed. 717 (1952) (sanctions "imposed in passion or pettiness, [bring] discredit to a court as certainly as the conduct it penalizes"). When the unprofessional conduct of counsel has not, of itself, precluded a fair trial, the trial judge must be particularly careful to avoid the creation of a situation in which his corrective measures substantially contribute to the evil sought to be avoided. And absent unprofessional conduct which, of itself, precludes a fair trial, "means of censure and discipline are available which do not affect the rights of a defendant to be able 'once and for all, to conclude his confrontation with society . . ..' " *United States v. Bristol, supra,* 325 A.2d at 187 n. 4, *quoting United States v. Jorn, supra,* 400 U.S. at 486, 91 S.Ct. 547. In this case it is apparent that the exhaustion of the trial judge's patience in his role as disciplinarian led to a confusion of that role with his primary role at trial, a situation in which deference to his assessment of trial prejudice is not fully warranted. And without the greatest deference to the trial judge's assessment of trial prejudice, we cannot say that the record supports a conclusion that the fairness of the trial was jeopardized by the conduct of counsel.

■ We need not consider whether, in another case, such a "breakdown in judicial machinery" might of itself present the manifest necessity for a mistrial. *See Gori v. United States,* 367 U.S. 364, 372, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961) (Douglas, J., dissenting). While breakdowns are bound to occur, "such as happens when the judge is stricken, or a juror has been discovered to be disqualified to sit, or when it is impossible or impractical to hold a trial at the time and place set" (*id.* at 372–73, 81 S.Ct. at 1528), there must be a point at which such breakdowns are not countenanced. *See, e. g., United States v. Bristol, supra; United States v. Gordy, supra. Cf. Downum v. United States,* 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963) (absence of key prosecution witness does not constitute manifest necessity), *citing with approval* (at 738 n. 1, 83 S.Ct. 1033) *United States v. Watson,* 28 Fed.Cas. No. 16.651, 499 (S.D.N.Y.1868) (illness of district attorney does not constitute manifest necessity where assistant district attorney was available to try case). To indulge wholly the subjective factors in an individual trial which might make more likely such a "breakdown in judicial machinery" would be "to throw open the door for the indulgence of caprice and partiality by the court, to the possible and probable prejudice of the defendants." *United States v. Watson, supra* at 501. This is not a case in which the conduct of any of the defense attorneys was in any sense out of the ordinary, imperfect though it was, nor is there any indication that the failings of trial counsel were willful or designed to produce a mistrial. Rather it is the case of ordinary failings escalating, before the jury, into a confrontation between counsel and the trial judge in disregard for the rights of appellants in their confrontation with society. We expect—and an accused has a right to expect—that his trial will, under ordinary circumstances, take precedence over the plight of his attorney. The exhaustion

of the trial judge's patience under such ordinary circumstances does not present a manifest necessity for mistrial.

Our conclusion that the trial judge did not exercise sound discretion is reinforced by the manner in which the trial judge arrived at his decision to declare the mistrials. After criticizing Mr. Liotta's performance and refusing to hear his response ("because I don't know what you're going to say"), the trial judge declared a recess. Immediately upon reconvening, the trial judge stated his intention to declare mistrials, ostensibly upon the grounds earlier urged by counsel but actually, as the record makes clear, for reasons of his own. Neither defense counsel nor the prosecutor had notice that the trial judge was considering declarations of mistrial, nor was there any opportunity for addressing the issues either before the trial judge reached his decision or before the jury was dismissed. Although the trial judge may have considered independently and rejected the possibility that measures short of mistrial might have sufficed to mitigate or cure any perceived undue trial prejudice, the record reflects nothing from which we might draw that inference. Cf. Arizona v. Washington, supra, 98 S.Ct. at 836, n. 39 (legal arguments and possible alternatives fully aired before trial judge determined to declare mistrial).

 "Judicial training and expertise, however it may enhance judgment, does not render memory or reasoning infallible." Herring v. New York, 422 U.S. 853, 863 n. 15, 95 S.Ct. 2550, 2556, 45 L.Ed.2d 593 (1975). Trial counsel, both for the government and for the defense, must serve and be permitted to serve not only as advocates in the trial of facts but as resources in the aid of legal reasoning and decision. When a trial judge rejects both their advocacy and their legal resources in arriving at a decision of crucial importance both to the parties at trial and to society, the resulting decision cannot be deemed to be the product of sound discretion absent a persuasive showing to the contrary.[17] Because the undisputed facts at trial do not, by themselves, reflect the manifest necessity for the declarations of mistrial and because the manner in which the decisions were made does not suggest the exercise of sound judicial discretion in arriving at that decision, "[w]e resolve any doubt 'in favor of the liberty of the citizen, rather than [in favor of] exercise [of] what would be an unlimited, uncertain, and arbitrary judicial discretion.'" Downum v. United States, supra, 372 U.S. at 738, 83 S.Ct. at 1035 (bracketted material added), quoting United States v. Watson, supra, 28 Fed.Cas. at 501.

## V

For the foregoing reasons, the order denying appellants' motion to dismiss the indictment is reversed, and these cases are remanded with instructions to dismiss the indictment.

*So ordered.*

---

17. We do not imply that a trial judge cannot exercise his sound discretion without the argument and advice of counsel. The issue upon review of such a decision, however, is not whether a sound discretion was in fact exercised but whether *from the record* we can say that a sound discretion was exercised. Where the undisputed facts upon which decision was made compel a conclusion that there was manifest necessity for a mistrial, the trial judge will be presumed to have exercised his sound discretion in reaching the only legally correct decision. Cf. *Glover v. United States,* D.C.App., 301 A.2d 219 (1973) (prolonged illness of accused). Conversely where the record compels a conclusion that a declaration of mistrial was inappropriate, the means by which the decision was reached is irrelevant. Cf. *Downum v. United States, supra* (absence of prosecution witness). Between these extremes, however, we must rely upon indications of record that the decision resulted from an exercise of judicial discretion. Patience in and attention to the arguments of government and defense counsel are strong indications that the trial judge has approached the decisionmaking task before him judiciously, taking "all the circumstances into consideration." *United States v. Perez, supra,* 22 U.S. at 580.