**STATE**

v.

**William A. SUNDEL and Frank W. Nelson.**

**No. 82–220–M.P.**

Supreme Court of Rhode Island.

June 2, 1983.

Reargument Denied June 23, 1983.

Dennis J. Roberts II, Atty. Gen., Kenneth P. Madden, Asst. Atty. Gen., for plaintiff.

John A. O'Neill, Jr., James H. Leavey, Providence, for defendants.

## OPINION

KELLEHER, Justice.

We have issued our common-law writ of certiorari to review the defendants' claim that a Superior Court justice erred when he denied their motion to dismiss an October 1981 two-count indictment that charged them with (1) conspiring to possess marijuana with an intent to deliver that substance and (2) possession of marijuana with an intent to deliver the same. The dismissal motion, which was based upon the constitutional guarantee against double jeopardy, can be better understood by a brief resume of the pertinent events that occurred in the Superior Court. Hereinafter we shall refer

to the defendants, William A. Sundel and Frank W. Nelson, by their last names.

Once the two-count indictment was returned, John A. O'Neill, Jr., a member of the Rhode Island Bar, entered his appearance on behalf of both Sundel and Nelson. Subsequently, on November 2, 1981, David Breitbart, a member of the New York Bar, filed a motion in which he asked to be permitted to appear pro hac vice as trial counsel for Sundel. The motion, which was endorsed by Sundel and Attorney O'Neill, was granted in early January 1982.

The trial did not actually begin until March 31, 1982, when the jury-impaneling process began. Sundel's new counsel took an active role during the jury-selection process. There were occasions during the voir dire when the trial justice and Sundel's counsel expressed a difference of opinion on a variety of matters. Before the day was out, the jury was duly impaneled, and on the afternoon of April 1 both the prosecutor and Sundel's counsel gave opening statements to the jury. Sundel's counsel described the prosecution's main witness, Michael Hall, a named defendant, as a schemer, a liar, and an individual who from the first day he decided to go into the marijuana business knew that eventually he would be caught and schemed and planned to give somebody else to the police in the eventuality he was caught. He urged the jurors to scrutinize Hall's testimony closely so that they would not be fooled in the same way the State Police had been.

The prosecution's first witness was a State Police detective, Corporal Edward P. Malley. He described a search undertaken pursuant to a search warrant in August 1981 of a one-story commercial building situated in Warwick off Quaker Lane in an industrial park. According to the corporal, during their search the police discovered 218 bales of marijuana located in the bins of a business enterprise apparently doing business as Hot Tubs of Newport. During the cross-examination of this witness, numerous objections to questions posed by Sundel's counsel were sustained on a variety of grounds, including relevancy, hearsay, inquiries that went beyond the scope of the direct examination, and questions that sought responses that were not within the personal knowledge of the witness. After Nelson's counsel, Mr. O'Neill, had finished his cross-examination, the witness was excused, and court recessed for the day.

Once the jury had left the courtroom, Sundel's counsel told the trial justice, "Your Honor, I have a due process application." He then spoke of a variety of matters, including his experiences as a trial attorney in New York and the lectures he had given at a law school relating to the law of evidence. In describing the trial justice's rulings on his cross-examination of Corporal Malley, Attorney Breitbart said, "I have never seen such a hypertechnical application in laying a foundation for my questions," and described the trial justice's rulings as a denial of due process.

After the trial justice had recounted his illustrious accomplishments at law school, Nelson's counsel entered the fray by saying he "would join in Mr. Breitbart's motion * * * and I would also add one of my own, Your Honor, [a] motion to pass and to sever for Your Honor's remarks * * *" after Mr. Breitbart had asked Corporal Malley how many arrests he had made during his thirteen years with the State Police.[1] The trial justice said that he would take the motions under advisement, and court adjourned for the day.

When the court convened on the following day, April 2, the trial justice noted that he had before him at that moment the April 1 motions that were being pressed in behalf of Sundel and Nelson. At that point Mr. Breitbart explained to the trial justice that

---

1. When the trial justice inquired about the relevancy of this inquiry, Mr. Breitbart referred to his opening statement to the jury in which he asked them "not to be fooled" by Hall's testimony "the way" "the most skilled interviewers in the State Police" were. Upon hearing his explanation, the trial justice sustained the prosecutor's objection with a comment, "Oh, my God."

he never intended his April 1 "due process application" to be regarded as a motion to pass. The trial justice agreed that the record would indicate that Sundel's attorney had not filed a motion to pass but then went on to offer some critical comments on the attorney's conduct during the pretrial suppression hearing, the jury-selection process, and his cross-examination of Corporal Malley.

In essence, the trial justice was concerned whether matters had reached the point where Mr. Breitbart's effectiveness to. represent Sundel had been diminished by his lack of knowledge of our rules of practice and procedure. His remarks also indicated that after court had adjourned on April 1, an in-chambers conference had taken place between the trial justice, the prosecutor, and both defense counsel. He also made it clear that if Sundel wished to continue with his present counsel, "I want him to be fully aware that he is doing so willingly, and intelligently, and with full knowledge as to what appears to the court to be perfectly obvious in this case."

When counsel was asked whether he had conferred with Sundel concerning the options that had been discussed the previous day at the in-chambers conference, Mr. Breitbart answered in the affirmative. After an exchange of remarks, Mr. Breitbart asked for a "ten-minute" recess. When the court reconvened, the trial justice announced that Mr. Breitbart's permission to appear as pro hac vice counsel for Sundel had been revoked, and Mr. O'Neill was then informed that he should confer with Sundel about whether there was any possibility of a conflict by a joint representation. Mr. O'Neill wasted little time in telling the trial justice that the conflict was real. Sundel was then asked if he desired to have other counsel, and his response was, "Yes, Your Honor." The trial justice, in light of Sundel's request, passed the case for trial before another jury on May 24. He then granted the motion to pass that Nelson had filed on April 1.

On May 21, 1982, a hearing was held on a joint motion filed in behalf of Sundel and Nelson in which they asked for a dismissal of the indictment because of the bar of double jeopardy. The trial justice denied the motion, and in due course we stayed all the proceedings and issued our writ.

The constitutional guarantee against double jeopardy protects a defendant in a criminal proceeding against multiple punishments or successive prosecutions for the same offense. *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977). It is generally accepted that in jury trials jeopardy attaches when the jury is impaneled and sworn. *State v. Alexander,* 115 R.I. 491, 494, 348 A.2d 368, 370 (1975). Ordinarily, when a mistrial is granted on the defendant's motion or with his consent, the principle of double jeopardy does not bar a subsequent prosecution. *Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982); *United States v. Dinitz,* 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976); *United States v. Jorn,* 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971). When a trial is terminated over the objection of the defendant, such action must be justified by the existence of a "manifest necessity"; otherwise, the defendant's valued right to have his trial completed by a particular tribunal is violated. *State v. Berberian,* R.I., 411 A.2d 308, 310 (1980).

Both Nelson and Sundel, by counsel, complain about a lack of any manifest necessity that would have warranted the actions of the trial justice. Nelson also contends that he never asked for a retrial, and Sundel now describes the trial justice's "summary disqualification" of Mr. Breitbart as a denial of his constitutional right to retain an attorney of his own choice. The state responds to these contentions by asserting that each defendant asked for a mistrial; thus, there is no prohibition against their being tried a second time. We shall first discuss Nelson's claim and then go on to consider the contention made in behalf of Sundel.

As one may recall, on April 1, 1982, Corporal Malley had completed his testimony and the jury had left the courtroom when Mr. Breitbart informed the trial justice of the pendency of his due-process application. After Sundel had made an objection to what he considered a restrictive cross-examination, Mr. O'Neill, Nelson's counsel, announced that he would join in his colleague's motion or add one of his own, a motion to pass and sever, based on the trial justice's "Oh, my God" comment after Mr. Breitbart had explained the rationale of his inquiry into the career arrests made by Corporal Malley.

On the morning of April 2, the trial justice and Mr. Breitbart engaged in the extended discussion that ultimately led to the request for the ten-minute recess. Just before granting the recess, the trial justice acknowledged the possibility that Sundel might seek other counsel but remarked,

> "I am trying to protect his rights and I am prepared, if he understands everything that I have said to him, to let this trial proceed and I will deny the motion of Mr. O'Neill based on our case law and we will proceed with this trial." [2]

 When the court reconvened after the recess, the trial justice announced that he was revoking Mr. Breitbart's pro hac vice status and that, in light of Sundel's request to seek counsel other than Mr. O'Neill, the case was being passed and assigned for trial to May 24, 1982. The trial justice then announced that, with regard to Nelson, the court "will grant his motion to pass this case and we will pass it to May 17 to be tried with the Sundel case." [3] At this point, Mr. O'Neill inquired, "May 24, isn't it, Your Honor?" and the trial justice said, "May 24, yes." This exchange indicates that Nelson's counsel was in full agreement that since Sundel was to obtain other counsel, Nelson's motion to pass would be grant-

ed and Mr. O'Neill and his client would be back in the courtroom on May 24 ready for trial. Consequently, Nelson's double-jeopardy claim was properly rejected when his counsel appeared before the trial justice on May 24.

On May 21, 1982, the trial justice considered arguments both pro and con on the joint motion for a dismissal of the indictment. It is clear from a reading of the transcript of the dismissal hearing that the "ten-minute" recess called for by Mr. Breitbart on April 2 extended beyond ten minutes. The trial justice had before him at the May hearing three affidavits, each of which was prepared by one of the three trial attorneys, Mr. Breitbart, Mr. O'Neill, and Kenneth P. Madden, an assistant attorney general. Their affidavits indicate that a portion of the April 2 recess was spent by the attorneys conferring with the trial justice in his chambers.

Mr. Breitbart's affidavit states that the trial justice unjustifiably terminated the trial "on his own motion, sua sponte, without the voluntary acquiescence, either express or implied, of the defense." In his affidavit, Mr. O'Neill estimated that the recess lasted an hour and recollected that the trial justice announced that he was no longer going to allow Mr. Breitbart to continue as counsel. According to Mr. O'Neill, the trial justice told Mr. Breitbart that he had the option of terminating the proceedings by way of a motion to pass or of being removed from the case with Mr. O'Neill taking over as counsel for both defendants in the absence of any conflict.

The assistant attorney general averred that (1) Mr. Breitbart had informed all conferees that Sundel desired to engage other counsel; (2) the trial justice advised Mr. Breitbart of several options available to him concerning his status as trial counsel, including rescission of his permission to ap-

---

**2.** The trial justice's denial was obviously aimed at Mr. O'Neill's joining in Mr. Breitbart's objection to the trial justice's "hypertechnical" restriction of his cross-examination of Corporal Malley.

**3.** In taking this action, the trial justice was obviously referring to Mr. O'Neill's motion in regard to the trial justice's reference to the deity.

pear or withdrawal as trial counsel; and finally, (3) the withdrawal option was rejected, and the trial justice was asked to rescind Mr. Breitbart's pro hac vice status.

After examining the affidavits, the trial justice remarked, "Well, one thing is obvious. Everyone has different views of what went on." The trial justice estimated that the conference lasted about an hour when word came to him by way of the sheriff that the trial was not going to proceed because there was going to be a change of counsel. Upon receipt of this news, he summoned counsel into his chambers to see what was going on because he was ready to proceed to the next case. The trial justice then stated that Mr. Breitbart had told him, "You do what you have to do, on the other hand, I have to say what I have to say because I do not want it to appear that I am not adequately representing my client."

In his bench decision, the trial justice also disclosed that at the in-chambers conference he had assured Mr. Breitbart that the rescission of his pro hac vice status would not imperil the attorney's right to appear before other trial justices in this state because his ruling applied only to "his courtroom" and would remain in effect until such time as he was "satisfied" that Mr. Breitbart had become more familiar with the rules. When the trial justice inquired of Mr. O'Neill if he recalled this in-chambers conversation, Mr. O'Neill answered in the affirmative.

The trial justice also stated that Mr. Breitbart informed him that he had spoken with Sundel and that under all the circumstances Sundel believed that there should be other counsel in the case. Mr. O'Neill also agreed that this observation coincided with his recollection. Later, the trial justice also revealed that Mr. Breitbart had told him that his post-recess objections were to be made solely for the purpose of protecting his reputation and had nothing to do with the passing of the case. Just prior to the actual denial of Sundel's motion to dismiss, the trial justice made it clear that, in his opinion, Sundel's request for a change of

attorneys was a voluntary act on his part. Consequently, he denied Sundel's motion and refused to postpone the May 24 trial date.

We were not present at the April 2 in-chambers discussions, but we cannot fault the trial justice's conclusions regarding what occurred during the extended ten-minute recess. However, we do know that Sundel cannot be considered a novice either in the narcotics business or in the give and take which goes on at the trial which usually follows after the police have shut down the business. Earlier, in *State v. Sundel,* 121 R.I. 638, 402 A.2d 585 (1979), we affirmed his convictions on two charges involving the illegal possession in his Newport home of cocaine and marijuana. The record regarding what happened in the courtroom just prior to the ten-minute recess clearly indicates that the trial justice had indeed expressed his willingness to continue the case with Mr. Breitbart as Sundel's counsel. It is also clear from the record that in the late afternoon of April 1 when the attorneys gathered with the trial justice for an in-chambers conference, Mr. Breitbart was admonished to explain the options available to Sundel; on the following day he assured the trial justice that the options had been explained to his client. Thus, we have no reason to disturb the trial justice's conclusion that, after having been given the options, Sundel willingly opted for other counsel and a subsequent trial. In light of this conclusion, Sundel's double-jeopardy claim must fall.

The petition for certiorari filed by both Sundel and Nelson is hereby denied, the writ previously issued is quashed, and the record in the case is remanded to the Superior Court with our decision endorsed thereon.