OPINION OF THE COURT
Martin H. Rettinger, J.
The following constitutes the opinion, decision and order of the court.
*931 The People have brought the defendant to trial for allegedly engaging with two others in a series of sales of glassine packets of heroin on June 2, 1987 in front of 138-140 Ludlow Street. The People’s proof would consist of testimony of police officers assigned to the Narcotics Street Enforcement Unit that the defendants were seen making such sales by the police through binoculars from an observation post located directly above 138-140 Ludlow Street. These observations were made during the course of a police observation operation which commenced at 7:30 a.m. and continued into the early afternoon. Although seven persons were arrested by the police as buyers of the heroin from the defendant and his codefendants, the charges involving three of the buyers were dropped due to the inability of the People to furnish the Grand Jury with the essential testimony of a police officer involved in the arrest of these buyers. The case involving another one of these buyers was not prosecuted due to his having snorted the contents of his purchase immediately at the scene. Consequently, only the counts of criminal sale of a controlled substance in the third degree involving the sale of heroin to the three remaining apprehended buyers were charged in the indictment. In addition, a further count charged the defendants with criminal possession of a controlled substance in the third degree based upon the recovery by the police of 10 packets of heroin from a jacket that one of them had draped over a parking meter at the scene that was used as the "stash” for the observed sales.
After pretrial suppression hearings for defendant Ramos and codefendant Rios (the third defendant previously absconded and is the subject of a bench warrant) were concluded before Hon. Herbert Altman, the case was transferred to Part 41 for trial on April 4, 1988. On April 6, 1988 Rios pleaded guilty to a reduced charge pursuant to a plea bargain. Defendant Ramos proceeded to trial. After the jury was selected, the court on April 8, 1988 entertained the defendant’s motion to preclude the People from calling Police Officer Thomas Moore to testify at the trial, because he had destroyed his memo book containing his entries concerning this case as part of a quasi-ritual upon his retirement from the New York City Police Department. The motion was granted based upon the inability of the People to provide the defendant with this Rosario material pursuant to the holdings in People v Ranghelle (69 NY2d 56), People v Novoa (70 NY2d 490), and People v Jones (70 NY2d 547).
The presentation of the People’s case then proceeded with *932 the prosecutor’s opening statement to the jury. Defense counsel declined to make an opening statement. The People then called their first witness, Police Officer John Gallagher. Gallagher testified that at 7:30 a.m. on June 2, 1987, he and Officer Keenan entered the abandoned building located at 142 Ludlow Street and took up an observation post on the third floor at a fire escape facing the front of the building. He stated that they took turns viewing the events occurring on the street below them. One of them would lean out onto the fire escape, make the observations concerning drug-sale activity occurring on the street below them and would tell the other what he saw. The other would transmit this information over the radio to the pickup team of officers to arrest the buyers shortly after they left the site of the sale. Gallagher then testified that 10 minutes after they took up their observation post, he saw two men and a woman walking northbound on Ludlow Street. They stopped in front of 138-140 Ludlow Street, the building adjacent to 142 Ludlow Street. He then observed the female remove her jacket and hang it over a parking meter. He then switched positions with Officer Keenan. The People then introduced into evidence a diagram representing the physical layout of the buildings and the streets that were germane to the testimony. Gallagher then testified that after he switched positions with Keenan, he received a communication from Keenan who was then leaning out of the fire escape, about 7:50 a.m. Gallagher further testified that he relayed the communication to the pickup teams by radio and received a radio response from the pickup teams 3 or 4 minutes later.
The prosecutor then asked Gallagher where he was at 8:45 a.m. that morning. Gallagher asked permission to refer to some notes. Defense counsel then inquired as to the nature of the notes to which Gallagher wished to refer. Gallagher responded: "I was given some notes from the assistant district attorney which she made up.”
Defense counsel then was given an opportunity to review these notes, which consisted of a white sheet of paper, about 9 inches by 14 inches. Lines were drawn on the paper to create 10 vertical columns and 9 horizontal columns. The vertical column headings referred to the name of the buyers of the narcotics; the time of the buy and of the arrests; the officer manning the observation post for the buy; the location of the arrest of the buyer; the number of glassines recovered by the buyer; the apprehending officer’s name; the searching officer’s *933 name; which defendant made the hand-to-hand sale; and the voucher numbers. The horizontal columns referred to the name of each of the apprehended buyers. The effect of this chart was to summarize the pertinent information concerning each of the buys that had resulted in an arrest during the course of the police operation that was the subject matter of Gallagher’s testimony. In regard to the buyer Jose Rivera, the chart under the heading "number of glassines” had the entry "snorted and threw away envelope.”
Upon reviewing the document in issue, defense counsel immediately moved for a mistrial upon the ground that the utilization of this chart and the failure of the prosecutor to disclose its existence to the defense constituted prosecutorial misconduct.
The court then heard extensive argument on the motion. The prosecutor was given an opportunity to respond to the charge. She reminded the court that she was new to the case, having volunteered to step in for the unavailable original prosecutor shortly before the pretrial hearings were held. She informed the court that she had created the chart at her home no more than two days prior to the trial. She compiled the chart to aid her in sorting out and focusing the many narcotic sales and arrests in this police operation, which involved a number of different sellers, buyers and officers. She prepared the chart by analyzing and collating the information appearing on the arrest reports, the on-line booking sheets, computerized arrest reports and the vouchers that had been turned over to defense counsel as Rosario material. In addition, she had utilized the information she had learned through conversations with the officers involved in the case. She made photocopies of the chart and gave the police officer witnesses she intended to call at trial an opportunity to review it and the option to keep it, which Officer Gallagher did. She believed that the chart would enable the officers, as well as herself, to focus exclusively on the three distinct narcotics transactions that were the subject matter of the three counts in the indictment without venturing into the other transactions that had been dismissed (for the reasons related above), which constituted uncharged crimes. As these three charged incidents were chronologically interspersed among those that were not prosecuted, she was apprehensive that the officers would mention these uncharged incidents during their testimony, which could necessitate a mistrial. She saw nothing improper in utilizing the chart as an aid to refresh the police *934 officer’s recollection on the stand as it was merely a summary of the actual police reports he could unquestionably refer to for this purpose.
In opposition to this innocuous portrayal of the chart, defense counsel pinpointed two instances where the information stated on the chart differed from Officer Gallagher’s pretrial hearing testimony. In particular, at the hearing Gallagher testified that the time of the sale by the defendant to George Gonzalez (the subject matter of the third count of the indictment) occurred at 8:20-8:25 a.m., while the chart stated the time of the sale as 8:50 a.m. Further, the chart provided the details of the alleged sale to Herman Rivera (the subject matter of the second count of the indictment), while Gallagher had previously testified that he had no personal recollection concerning this transaction.
The prosecutor responded by reiterating that she had obtained the information stated on the chart from the arrest reports. In regard to the 8:50 a.m. time for the Gonzalez sale, the prosecutor stated she had arrived at this time by estimating from the arrest reports that it occurred about 8:45-8:50 a.m. The chart information concerning the Herman Rivera transaction was gleaned from arrest reports prepared by officers other than Officer Gallagher.
As defense counsel emphasized, it is clear that the chart information either differed with Gallagher’s previous testimony or supplied information otherwise unknown to him.
The defense argued that the use of the chart undermined its ability to effectively cross-examine this witness as well as the other police officers concerning discrepancies between the hearing testimony and the felony complaint as to the time certain charged sales had occurred. As all of these witnesses would have the benefit of studying the same chart, they would be able to uniformly conform their testimony at trial concerning the essential facts of each sale to what amounted to a "script”. In addition, it was argued that by synthesizing and making reasoned deductions from the information in all the arrest reports to provide the times for all of the sales listed on the chart, the prosecutor had gone beyond restating data contained in the reports. Rather, the prosecutor had, albeit unintentionally, impermissibly interjected her credibility as a source of information on the chart as an issue before the jury.
The prosecutor countered by analogizing the preparation of the chart to the creation of the diagram depicting the streets *935 and buildings described in the testimony of Officer Gallagher, which was drawn up by a different prosecutor and was introduced into evidence as People’s exhibit number 1. The chart in accord with this view would constitute a verbal diagram drawn by the prosecutor of the criminal events underlying the charges that could be displayed to the jury (minus the information relating to the uncharged incidents) as part of the People’s case-in-chief as an item of demonstrative evidence.
The prosecutor’s primary counterargument is that it is an established rule of evidence that anything may be used to refresh the recollection of a witness. When a writing is employed as the refreshing prod, the witness does not have to be the author of the writing and it need not have been made as a contemporaneous record of the events described therein. (Fisch, New York Evidence § 332 [2d ed].) However, there are limitations upon the use of such refreshing matter. "Whether the material will revive the recollection of the witness so as to enable him to testify from his own present knowledge rather than furnish him with imaginative material or a false memory is the sole determinant of its propriety” (Fisch, op. cit.).
In support of their argument that the chart is a proper tool for refreshing the testimony of the witness, the People have cited the holdings in United States v Schwartzbaum (527 F2d 249) and People v Goldfeld (60 AD2d 1). In United States v Schwartzbaum (supra) the witness on cross-examination conceded the possibility that he had not made a payoff to the particular union official he had named during his direct examination. On redirect, the prosecutor was permitted to refresh the witness’ memory by showing him a summary of an earlier interview with the prosecution in which he had recalled the use of that particular union official’s name. The witness then reaffirmed the testimony he had given on direct. On appeal, this procedure was upheld based upon the prosecutor’s explanation of the innocent history of the document and the fact that the witness had given substantially similar testimony on direct examination on the issue of the identity of the payoff payee.
In People v Goldfeld (60 AD2d 1, supra), the trial court permitted a prosecution witness during direct examination to refresh his recollection by referring to a bill of particulars that had annotations made by the witness and the prosecutor. On appeal it was held that this was permissible as the record demonstrated that the document was offered in good faith to refresh the witness’ recollection. Most significantly, it was *936 found that the witness "did not testify solely on the basis of the exhibit, but merely used it to stimulate his memory in this complex criminal trial involving many separate occurrences” (supra, at 11-12).
In both of these cases, the trial and appellate courts were satisfied that the witness had an independent recollection of his own of the matters he was testifying about that was merely refreshed by the use of the document in question. There was no risk therefore that the witness would fill a void in his knowledge of the facts about which he was called upon to testify by adopting information contained in the "refreshing” document.
However, in this case the defense has demonstrated by reference to the suppression hearing minutes that Officer Gallagher’s testimony concerning the time of the alleged sale by the defendant to George Gonzalez differed by about one-half hour from the time stated in the chart and that he had no personal recollection of the alleged sale by the defendant to Herman Rivera. The employment of the chart therefore presents a palpable danger that this witness (and possibly the other police witnesses in the case as well) would rely on and adopt the information contained therein to bridge gaps in their knowledge of the events that are the basis for the charges (see, Brown v Western Union Tel. Co., 26 AD2d 316). As the product of the prosecutor’s thorough analysis of all the reports and documents that were filed by all of the officers in the case, the chart represents the homogenization of all of the information known _to the People about the events served up in a readily digestible form for the consumption of the officer witnesses and, ultimately, for the consumption of the jury. There is a readily apparent risk that the use of the chart could unwittingly have the effect of "programming” the testimony of the witnesses to accord with its play-by-play account of the events underlying this prosecution.
For these reasons, the court determined that the use of the chart constituted an error by the prosecutor of sufficient dimension to prejudice the defendant to the extent of depriving him of a fair trial. Accordingly, the defendant’s motion for a mistrial was granted pursuant to the standards set forth in CPL 280.10 (1).
THE ROSARIO MISTRIAL MOTION
In the course of oral argument on the mistrial motion, the *937 prosecutor became aware that she had inadvertently failed to provide defense counsel with the Grand Jury testimony of Police Officers Moore and Mantone, who were part of the pickup team involved in this case. She immediately sought to rectify this lapse by handing the material to defense counsel. Defense counsel made a motion for a mistrial based upon the independent ground that the prosecutor had failed to provide him with this Rosario material prior to her opening statement to the jury as required by CPL 240.45 (1) (a).
It is true, as defense counsel has argued, that the Court of Appeals has in recent years held that a total failure of a prosecutor to provide the defense with Rosario material requires a reversal of the conviction, regardless of the good faith of the People and without a demonstration of prejudice to their case by the defense (People v Ranghelle, 69 NY2d 56, supra; People v Novoa, 70 NY2d 490, supra; People v Jones, 70 NY2d 547, supra).
However, these same cases recognize a distinction between a total failure and a mere delay in delivering such Rosario material to the defense. "When the People delay in producing Rosario material, the reviewing court must ascertain whether the defense was substantially prejudiced by the delay. When, however, the prosecution fails completely in its obligation to deliver such material to defense counsel, the courts will not attempt to determine whether any prejudice accrued to the defense. The failure constitutes per se error requiring that the conviction be reversed and a new trial ordered (see, People v Perez, 65 NY2d 154, 159-160, supra). Finally, the People’s good-faith effort to locate, identify and discover all Rosario material does not excuse their failure to produce covered material (compare, People v Bigelow, 66 NY2d 417, 427 [rejecting the 'good-faith exception’ to the warrant requirement]; People v Simmons, 36 NY2d 126, 132 [People’s good faith will not excuse failure to turn over Brady material]).” (People v Ranghelle, 69 NY2d 56, 63, supra.)
It is clear therefore that where, as in the case at bar, there has been merely a delay rather than a complete failure in supplying the defense with the Rosario material, the court must determine whether the defense was substantially prejudiced by the delay. In regard to Police Officer Moore’s testimony, no prejudice can be demonstrated as the court for the reasons previously stated precluded the People from calling him as a witness at trial. As for Officer Mantone’s Grand Jury testimony, I find that it was provided to the defense in ample *938 time for defense counsel to review it and to determine its efficacious use for purposes of cross-examination.
Accordingly, the motion for a mistrial based upon a failure to turn over Rosario material would have to be denied.
THE DOUBLE JEOPARDY MOTION
After the defense motion for a mistrial was granted, the defense brought a motion to bar the retrial of the defendant upon the ground that such a prosecution would violate his constitutional rights against being placed in double jeopardy (US Const 5th, 14th Amends; NY Const, art I, § 6; CPL 40.20 [1]).
As a general rule, when a mistrial is granted upon the motion of the defense there is no double jeopardy bar to a retrial even when the basis for the mistrial was prosecutorial or judicial error (United States v Dinitz, 424 US 600; United States v Jorn, 400 US 470; Drayton v Hayes, 589 F2d 117; Matter of Potenza v Kane, 79 AD2d 467). However, an exception to this rule has been recognized when the mistrial motion was provoked by egregious prosecutorial conduct calculated to leave the defense no other choice but to move for a mistrial. "It is not enough that the prosecutor’s conduct is motivated by a desire to gain an edge over defendant. Such misconduct may require a new trial, but it will not normally prevent reprosecution. Reprosecution will be prohibited only if the misconduct was aimed at vitiating the protection of the double jeopardy clause to gain a more favorable opportunity to convict defendant. Concededly, motivation may be difficult to determine, but the misconduct must be so reprehensible as to justify the inference that it was done in bad faith for the purpose of provoking defendant’s motion. Prejudice to defendant is also a part of the equation, for logically, if defendant has not been prejudiced, it would seem that his motion was not coerced but was voluntary and made for strategic purposes (Mitchell v Smith [633 F2d 1009], supra, p 1013; Drayton v Hayes [589 F2d 117], supra, p 122).” (Matter of Potenza v Kane, 79 AD2d 467, 470-471, supra.)
In the present case, I have determined that the prosecutor’s creation and use of the chart that caused a mistrial was not motivated by bad faith. Rather, it was due to her mistaken good-faith error that the chart was a proper means of preparing and focusing the testimony of the police officers for trial. Plainly, it never occurred to her that the use of the chart *939 would terminate the trial of this case at the beginning of the direct examination of the People’s first witness. In the absence of prosecutorial bad faith, the fact that the defendant was prejudiced by the use of the chart by the People’s witness is an insufficient basis for barring a retrial on double jeopardy grounds.
In light of the court’s mistrial ruling based upon the use of the chart, the People are directed to abstain from using the chart in any manner in the preparation of their witnesses for the new trial.
The previous utilization of the chart has created an issue as to whether the police officer witnesses at the new trial will testify based upon their own memory of the events that occurred on June 2, 1987 or based upon the information contained in the chart. To adequately address this issue, defense counsel may deem it advisable to call the Assistant District Attorney who drew up the chart and was the trial assistant herein as his witness at the new trial. This should not present a problem, as the court has been advised that the Assistant District Attorney who was originally assigned to the prosecution of this case will be the trial assistant at the new trial. Defense counsel therefore will have an opportunity to fully explore the ramifications of the employment of the chart at this trial upon the credibility and reliability of the police officer witnesses at the new trial.
Based upon the foregoing reasons, the defendant’s motion to bar the People from bringing him to trial again on this indictment is denied.