115 F.3d 737
 97 Cal. Daily Op. Serv. 4580, 97 Daily Journal
D.A.R. 7601
UNITED STATES of America, Plaintiff-Appellant,
v.
Anibal Ramiro GAYTAN; Jesus Avmando Portillo; and Roman
Hector Mungia-Meza, Defendants-Appellees.
 No. 96-10345.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 6, 1997.
Decided June 18, 1997.
 
 Georgia B. Ellexson, Assistant United States Attorney, Phoenix, AZ, for plaintiff-appellant.
 Susan Bryson Fox, Ralls, Valenzuela, Fox & Jones, P.C., Robert Clayton Hernandez, and Homero Torralba, Nelson & Torralba, Tucson, AZ, for defendants-appellees.
 Appeal from the United States District Court for the District of Arizona; Richard M. Bilby, Chief District Judge, Presiding. D.C. No. CR-95-00010-RMB.
 Before: REINHARDT, HALL and THOMPSON, Circuit Judges.
 REINHARDT, Circuit Judge:
 
 
 1
 Following the district court's dismissal of this case with prejudice during the course of the trial, on account of a Brady violation, we reversed and remanded. We left open the question whether the Double Jeopardy Clause barred further prosecution. The district court held that it did and dismissed the indictment once again. We must now determine whether the district court erred in dismissing the case a second time.
 
 BACKGROUND
 
 2
 Following a federal grand jury indictment of Anibal Gaytan, Jesus Portillo and Roman Munguia-Meza[1] for conspiracy to possess with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1), all three defendants filed initial motions for government disclosure of exculpatory information regarding confidential informants pursuant to Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In its written response, the government asserted that it was free to withhold this information if it believed that the informants needed to be protected. Furthermore, it stated that it was the defendants' burden to show that the information was relevant to their defense. Moreover, the government stated that it "ha[d] already gone beyond that [which is] required by [Brady] and [had] ma[de] available the investigatory file in this case." The government added, finally, that it was not "require[d] to create exculpatory evidence."
 
 
 3
 At the hearing on the defendants' motions, the government again stated that it had exceeded the requirements of Brady. It also stated that the identity of the confidential informant, when revealed, would not lead to extensive investigation by the defense because "he has no prior arrests, ... [and] there's not going to be a whole lot of snooping." The district court reminded the government that all Brady material regarding the confidential informant must be produced at least one week prior to trial. The district court further stated that if newly disclosed information required any additional investigation by the defense, it would grant a continuance. Because the government assured the court that it would comply with its Brady obligations, the court denied defendants' motions without prejudice.
 
 
 4
 The defendants continued to file motions regarding the government's lack of disclosure of information about its witnesses and confidential informants.[2] What most concerned them was the government's apparent lack of disclosure about possible informants Hector Minjarez and Fernando Carrette. At the hearing on the motions held shortly before trial, defendants argued vigorously for disclosure of Brady material regarding the two potential informants, as well as other witnesses. Gaytan asserted that four days earlier he and the other defendants had been informed that Carrette was a confidential informant and that he would be testifying.[3] At that time, the government told the defense that five years prior to the transactions involved in the current prosecution, Carrette had used cocaine. Gaytan informed the court that he suspected, but could not prove, that Carrette and Minjarez had been engaged in conducting drug transactions together during the period in which the charged conspiracy had allegedly occurred. He expressed concern that Minjarez was actually the person who had put the entire deal together and that the government was not disclosing this information to the defense. The government then admitted that Carrette had agreed to be a confidential informant in order to "work off some of [Minjarez'] beef." Gaytan also expressed concern that another of the government's witnesses, Elizabeth Walker, Minjarez' sister, had been offered the opportunity to have an arrest expunged in exchange for testimony in the case. The district court responded:
 
 
 5
 THE COURT: Well, all I can tell you, that's easy; if that occurred [the government's granting of immunity in exchange for testimony] and they don't tell you that and I ever found out about it, the case is gone, and they're in more trouble than they ever want to be in.
 
 
 6
 [GAYTAN]: Well, maybe you could direct the Court to--the Government to give that information.
 
 
 7
 THE COURT: Well, that,--you know, the way I deal with Brady material is, they know what Brady material is, and if they don't produce it, they lose, that's just--it's real easy.
 
 
 8
 While the government did concede that Minjarez was "the conduit who introduced Mr. Gaytan to the CI (Carrette) once a year ago and then coincidentally the CI was in there the day Gaytan came in to do business and it went from there," it assured the court that Minjarez was not a big part of the deal. The court warned the government that it would "throw the case out" if Minjarez was the "big shot behind all of this."
 
 
 9
 At trial, Agent Thornhill testified for the government that prior to the commencement of the investigation of the defendants Carrette had approached him about becoming a confidential informant in order to obtain "consideration for his friend" Minjarez, who was the subject of a Drug Enforcement Agency (DEA) investigation. He further testified that during this same time period Minjarez had been trying to put a marijuana deal together in order to help his own case with the DEA. Thornhill also acknowledged that it was Minjarez who had ordered the two-way radios that were used to communicate between the vehicles during the drug transaction involved in the instant prosecution. During the noon recess, Gaytan and Portillo moved for additional disclosure regarding the extent of Minjarez's involvement in the activities underlying their prosecution.[4] The court observed that Minjarez was involved to a greater degree than the government had previously revealed, but stated that it would address a possible in camera disclosure at the end of the day.
 
 
 10
 During direct examination the next day, Carrette revealed that he had guarded stash houses and also acted as a bodyguard in various drug deals. He further confessed to having snorted cocaine and consumed alcohol with defendant Gaytan the night before the initial meeting with Agent Thornhill and Minjarez. Following Carrette's direct examination, Gaytan requested a sidebar to discuss the witness's prior involvement in the drug business. The court again stated that it would consider the matter later.
 
 
 11
 During cross-examination, Carrette testified that he had been armed while serving as a stash house guard and also while serving as a bodyguard. Furthermore, Carrette testified that he had informed the Assistant United States Attorney of all of his activities in the drug trade during their initial meeting. After sustaining the government's objection to a question asking Carrette to summarize a series of events, the court declared a lunch break. When the jury had left the courtroom, the judge asked Gaytan if he wanted to make a motion. Gaytan deferred to Portillo who stated that they both had a motion. Portillo then launched into a discussion of their prior efforts to obtain disclosure of information regarding Carrette and reiterated his earlier complaints regarding the government's conduct. Before any motion was made, the court interrupted and the following dialogue occurred:
 
 
 12
 THE COURT: Well, it seems to me you're in the best of all worlds, because if they admit he told them all this stuff, the case is gone. I'll just tell you that right now. I warned them. But you're assuming this guy is telling the truth. You've brought out the fact that he's lied 20 times in 20 different ways. So it seems to me that they're stuck with the fact that they knew and didn't tell you or this guy lied to them.
 
 
 13
 [PORTILLO]: I think--
 
 
 14
 THE COURT: So it's too early for me to rule. I assume we're going to hear from [Agent Thornhill] again, who's going to get back up on the stand and deny he told him about the fact that he carried guns, that he was a guard, that he had been in the drug smuggling business, then they haven't violated Brady. But if they admit that he told them all this stuff and they didn't tell you, it's gone.
 
 
 15
 [PORTILLO]: Well, Your Honor, I think it's gone then. Because I think that the government has already told you before our last break that they did have the information and they did not give that to us. I'd be satisfied with taking the statement of [the AUSA] right now and we won't have to wait for [the government witness].
 
 
 16
 The court then asked the Assistant United States Attorney whether she had disclosed to the defendants that Carrette had been in the drug business. She stated that she had known of Carrette's drug involvement both with respect to the use of drugs and the armed guarding of the stash houses, but that she had told the defendants only about the prior use. She explained that she thought that she only had to reveal information pertaining to "credibility and veracity" of the informants. After a brief exchange, the court stated:
 
 
 17
 THE COURT: ... If you're in my courtroom and you've got a confidential informant who's been in the drug business, you better reveal it. And this case is going to teach you how. The motion is granted and the case is dismissed with prejudice.
 
 
 18
 (Applause)
 
 
 19
 THE COURT: Shut up. Don't do that. I know these people have been in the drug business and I know they're going to be after them and I hope they catch them. And the only reason they're getting out is because the government messed up. Don't think that they're going to be free of surveillance, because I hope they do get caught.
 
 
 20
 [AUSA]: Judge, I'm going to make my motion--
 
 
 21
 THE COURT: The next person that applauds is going to get held in contempt.
 
 
 22
 [AUSA]:--could I just put my motion on the record that I'm going to appeal your decision.
 
 
 23
 THE COURT: I hope you may.
 
 
 24
 (end of proceedings)
 
 
 25
 The court then quickly left the bench. Following the abbreviated lunch break, the jury was dismissed, apparently without counsel being present.
 
 
 26
 At the court's telephoned instruction that afternoon, the parties returned the following morning for a hearing on release pending appeal. Before the court ruled on the release motion, the defendants addressed the events of the previous day:
 
 
 27
 [GAYTAN]: ... before yesterday morning I had made a reservation along with [Portillo] concerning Rule 16 and Brady material. During the intermission, I handed to this Court's clerk three documents that I wanted the Court to take into consideration before I did any arguing concerning the Rule 16 and Brady material. Those documents are with the Court's clerk at this point, and I'd ask the Court to look at those documents in light of what the Court's decision was yesterday....
 
 
 28
 THE COURT: I've already ruled on that.
 
 
 29
 [GAYTAN]: I know that, Judge, but my--
 
 
 30
 THE COURT: And I ruled on it without looking at that.
 
 
 31
 [GAYTAN]: Yeah. My position is that at the point that this Court decided to dismiss this case, my position was going to be that the witness be stricken, and that in essence that would have been a judgment of acquittal on the facts of this case....
 
 
 32
 THE COURT: Sure.
 
 
 33
 [GAYTAN]: Okay.
 
 
 34
 THE COURT: It ought to clearly reflect that wasn't the basis upon which I did it. I dismissed it for the Brady violations. I dismissed the case with prejudice. You know, I didn't strike his testimony or anything of that nature.
 
 
 35
 [GAYTAN]: That would have been what I would have asked the Court to have done at that point.
 
 THE COURT: I understand that.[5]
 
 36
 The government appealed the dismissal with prejudice on the grounds that the withholding of Brady material did not constitute a due process violation and that the dismissal was not a proper exercise of the court's supervisory power. In an unpublished memorandum disposition, we reversed the district court's order. We held that because the Brady violation could have been easily remedied by the granting of a continuance or the ordering of a mistrial, the sanction of dismissal with prejudice was not warranted. We declined to rule on the question whether retrial was barred on Double Jeopardy grounds.
 
 
 37
 After the case was returned to the district court, Gaytan moved to dismiss the indictment pursuant to the Double Jeopardy Clause. The district court held oral argument on the motion and reflected upon the events surrounding the original dismissal:
 
 
 38
 THE COURT: Well, I think it's a close call, but in light of what's gone on, I'm going to resolve in favor of the defendants on the grounds that I probably did preclude them from making a motion because I was mad. I can remember how mad I was.
 
 
 39
 And I think under those circumstances, by filing the next day they did make a response. So under those circumstances, I feel that they would have made a motion [to suppress Carrette's testimony]. And had they made that motion or been allowed to make it before mine, why it certainly would have been granted, and that would have done away with the government's case.
 
 
 40
 So I'm going to order that the case be dismissed on double jeopardy grounds.
 
 
 41
 The court then dismissed the indictment once again and the government again appealed. It asserts that the district judge's factual findings are clearly erroneous and that he erred in dismissing the case. We disagree.
 
 ANALYSIS
 
 42
 The Double Jeopardy Clause of the Fifth Amendment "protects a defendant in a criminal proceeding against multiple punishments or repeated prosecutions for the same offense." United States v. Dinitz, 424 U.S. 600, 606, 96 S.Ct. 1075, 1079, 47 L.Ed.2d 267 (1976). It contemplates that the state will be afforded one full and fair opportunity to marshal its resources to convict a defendant, Arizona v. Washington, 434 U.S. 497, 505, 98 S.Ct. 824, 830, 54 L.Ed.2d 717 (1978), but also that criminal defendants will not be required to live in a "continuing state of anxiety and insecurity," without a definite resolution of the criminal charges against them. Dinitz, 424 U.S. at 606, 96 S.Ct. at 1079. Moreover, as the Supreme Court has pointed out, multiple trials "enhanc[e] the possibility that even though innocent [a defendant] may be found guilty." Green v. United States, 355 U.S. 184, 187, 78 S.Ct. 221, 223, 2. L.Ed.2d 199 (1957).
 
 
 43
 Jeopardy attaches when the jury is empaneled and sworn. See United States v. Jorn, 400 U.S. 470, 479, 91 S.Ct. 547, 554, 27 L.Ed.2d 543 (1971). Once this occurs, the defendant has a right to have his case presented to that jury. Arizona, 434 U.S. at 503, 98 S.Ct. at 829; Jorn, 400 U.S. at 485, 91 S.Ct. at 557. In particular circumstances however, his right may be "subordinate[d] to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury." Arizona, 434 U.S. at 505, 98 S.Ct. at 830. Specifically, while the Double Jeopardy Clause "unequivocally prohibits a second trial following an acquittal," Id. at 505, 98 S.Ct. at 830 when a mistrial is declared the rules are more complex. The principle that is controlling here may, however, be stated relatively simply. If a judge declares a mistrial after the proceedings have commenced, retrial will be permitted only if the defendant consented to the mistrial or if the mistrial was justified by manifest necessity.[6] Id. at 505, 98 S.Ct. at 830; United States v. Bates, 917 F.2d 388, 392 (9th Cir.1990), as amended.
 
 
 44
 If the defendant does not expressly consent to the mistrial, consent may be inferred "only where the circumstances positively indicate a willingness to acquiesce in the mistrial order." Weston v. Kernan, 50 F.3d 633, 637 (9th Cir.) cert. denied, --- U.S. ----, 116 S.Ct. 351, 133 L.Ed.2d 247 (1995) (quoting Glover v. McMackin, 950 F.2d 1236, 1240 (6th Cir.1991)). Although the government argues that the defendants' actions here positively indicated approval, we conclude that the district court did not clearly err in reaching the contrary conclusion.
 
 
 45
 The government's reliance on United States v. Smith, 621 F.2d 350 (9th Cir.1980), is misplaced. Although in Smith the defendant neither requested nor expressly consented to a mistrial, the court found implied consent as the result of specific and unambiguous conduct on the part of defense counsel that demonstrated consent. Specifically, prior to the time the court dismissed the jury, defense counsel had been made fully aware by the court that another trial would occur, and in fact had freely participated in the court-conducted preparations for that subsequent trial. During the pre-dismissal discussions, defense counsel clearly manifested his understanding and agreement that a second trial would take place.[7] Id. As the Smith court stated "[t]hese items show that defense counsel not only did not object to the order of mistrial, but affirmatively indicated his understanding that there could and would be a retrial. This is enough to constitute implied consent." Id. at 352.
 
 
 46
 Here, by contrast, once the court determined what had happened with respect to the Brady violation, the defendants temporarily lost all ability to influence the course of the proceedings. The judge admonished the prosecutor and ordered the case dismissed, without pausing for any discussion of the possibility of other remedies, all in a matter of seconds. It is quite apparent from the district court's subsequent candid remarks that it acted in a burst of anger. Although the jurors were not formally discharged until after they returned from lunch, the judge terminated the proceedings as soon as the prosecutor completed her explanation, took note of the government's intention to appeal, and left the bench precipitously without affording counsel any opportunity for further colloquies. Unlike in Smith there were no discussions of any kind regarding future plans prior to the court's departure.[8]
 
 
 47
 In United States v. Dinitz, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976), the Supreme Court emphasized the importance of the opportunity for careful deliberation on the part of the defendant when prosecutorial error has occurred. In Dinitz, the Court stated that "the important consideration, for purposes of the Double Jeopardy Clause, is that the defendant retain primary control over the course to be followed in the event of such error." Id. at 609. Precisely the opposite occurred in this case. When the court became angered over the government's Brady violation, the defendants lost control over the course of events. As the district court subsequently determined, there was no opportunity for the defendants to consider let alone decide upon a course of conduct, either individually or collectively. Prior consultations that may have occurred regarding hypothetical possibilities were not sufficient to allow defendants to evaluate their options following the receipt of the testimony of the confidential informant, a key government witness. As the Seventh Circuit made clear in Lovinger v. Circuit Ct., 845 F.2d 739 (7th Cir.1988), it is important for defendants to have the chance fully to assess their positions as of the time the mistrial is ordered--in this case, after the informant's testimony has taken place. The Seventh Circuit's rationale was clearly stated: "[The defendant's] assessment of his chances of acquittal may well have changed in the interim between the perfunctory mistrial motion and the eventual mistrial declaration." Id. at 744. Here, the precipitous action by the district judge did not afford an adequate opportunity, following the confidential informant's testimony, for defense counsel to discuss the various possible choices with their clients let alone to consult among themselves as to the best approach for them to take on a unified basis. The government's argument that we should reverse because defendants had "long-term" knowledge that the court would dismiss if a Brady violation were proven is inconsistent with Lovinger as well as highly speculative. There often are substantial differences between what judges tell counsel they will do under hypothetical circumstances and what they do when, after the record is fully developed, they hear arguments on matters as they actually stand. That, at least, is how the judicial process is supposed to work.
 
 
 48
 The government's argument that because the prosecution managed to interject her intent to appeal, the defendants could have objected to the dismissal is equally unpersuasive. While the prosecutor was not required to consult with anyone before announcing that she would appeal, conscientious defense counsel are obligated to consult with their clients and with one another before selecting course of action. For the reasons already explained, we cannot agree that the defendants should have known what the judge would do when the record was developed and the truth finally emerged, or that they should have been prepared to determine on the spot their position on an issue of such vital importance to their clients.
 
 
 49
 Although the government in this case argues that the defendants consented to the mistrial, the district court properly found that such was not the case. As its final argument, the government points to the fact that when the trial court stated that "if the[ ] [prosecutors] admit that [Carrette] told them all this stuff and they didn't tell you, it's gone ... " defense counsel responded, "Well, Your Honor, I think it's gone then." The defendants assert, correctly, that the mere "mirroring" of the court's terminology prior to an actual discussion of specific sanctions or other remedies does not constitute consent. "It's gone" is, in any event, an ambiguous phrase because, as we discuss further below, the case would also have been "gone"--and even more definitively so--if the trial judge had granted a defense motion to strike Carrette's testimony and ordered a judgment of acquittal. Moreover, defendants made no comments implying consent after the court announced its ruling. There simply were no "affirmative" expressions by counsel consenting to the dismissal, then or ever. Smith, 621 F.2d at 352. Under those circumstances, we cannot find implied consent.
 
 
 50
 The defendants' actions at the hearing on the day after the dismissal strongly support the district court's post-remand findings that they did not consent, expressly or impliedly, to a mistrial. The defendants stated that, had they been given the opportunity, they would have asked that Carrette's testimony be stricken and, once the government was deprived of its star witness, the court would have had no choice but to grant a motion for judgment of acquittal. At the post-remand hearing, the court acknowledged that the defendants had had no chance to take the actions they had described. The court specifically found that, given time to deliberate, the defendants would have made the motion to suppress Carrette's testimony, and then would have requested a judgment of acquittal on the ground that the government's case was contingent upon Carrette's testimony. Even more important, the court found that had the motions been made it would have granted them. On the basis of the record before us, we have no reason to question any of the district court's factual determinations. Certainly, we cannot say that any of the district judge's findings in this case are clearly erroneous. See Bates, 917 F.2d at 393. Accordingly, we must affirm.
 
 CONCLUSION
 
 51
 We affirm the district court and hold that retrial of the defendants in this matter is barred by the Double Jeopardy Clause.
 
 
 52
 AFFIRMED.
 
 
 
 [1]
 The indictment also named Jorge Costello-Cano, who fled prior to trial and still remains a fugitive
 
 
 [2]
 Gaytan filed a Motion to Compel the government to comply with a discovery order concerning grand jury transcripts and notes of an agent who testified at a motion hearing. Portillo filed a Motion for Sanctions regarding the government's failure to comply with those orders. Munguia-Meza later joined the motion. Portillo also filed a supplemental request for discovery regarding government witnesses and confidential informants. Gaytan filed a Motion for Sanctions, asking that the government be prevented from using 70 pages of documents disclosed just four days prior to the scheduled commencement of trial as well as a Motion to Produce Additional Brady material regarding a government witness. Portillo moved to continue the trial based on late disclosure of a government witness
 
 
 [3]
 We use the names of the defendants rather than those of their counsel when describing counsel's colloquies with the court in order to simplify the opinion
 
 
 [4]
 Munguia-Meza's counsel was not present at the time
 
 
 [5]
 Munguia-Meza's regular attorney did not attend this hearing. Instead a replacement appeared on his behalf. She was silent throughout the hearing except on the issue of bail
 
 
 [6]
 The government acknowledges that implicit in our earlier holding that the district court's dismissal for Brady violations was erroneous, is the conclusion that the dismissal was not manifestly necessary. Accordingly, it does not argue "manifest necessity." We agree and do not address that exception further
 
 
 [7]
 The defense counsel in Smith asked that the jurors be instructed not to discuss the case, and he participated in a discussion of the availability of the various attorneys for the second trial at specific times. One of the reasons for his request regarding the jurors was his concern that some of them might be empaneled again for the retrial. As to the schedule for the second trial, defense counsel advised the court he could retry the case within a few weeks. Voir dire on evidentiary matters regarding two potential witnesses was also conducted so that time could be saved if the same judge were to preside at the subsequent trial. Smith, 621 F.2d at 352. Only after the discussions regarding the retrial were completed did the judge dismiss the jury
 
 
 [8]
 The record reveals that the jury was dismissed sometime after it returned from the lunch break--presumably as soon as it returned--and it appears that this occurred without counsel being present. In any event, the government does not argue that defendants had any obligation to take any action between the time of the judge's abrupt departure from the courtroom and his dismissal of the jury. It does suggest, however, that defendants could have advised the court of their position later in the afternoon. Had they done so then, instead of the following morning, it would have made no difference whatsoever, as we made clear in United States v. Bates, 917 F.2d at 393 n. 8