# Third District Court of Appeal

## State of Florida

Opinion filed April 6, 2016.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D13-3119
Lower Tribunal No. 13-7057
_____

**Dwaine Merchant,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Marisa Tinkler Mendez, Judge.

Andrew Paul Kawel, for appellant.

Pamela Jo Bondi, Attorney General, and Jay Silver, Assistant Attorney General, for appellee.

Before EMAS, FERNANDEZ and SCALES, JJ.

EMAS, J.

## INTRODUCTION

Appellant, Dwaine Merchant ("Merchant"), appeals from a final judgment of conviction and sentence for first-degree murder following a retrial. Merchant contends that the trial court violated his double jeopardy rights by declaring a mistrial in his first trial, without Merchant's consent and in the absence of manifest necessity, thus barring a retrial. We agree, and for the reasons that follow, we vacate the judgment and sentence, and reverse and remand this cause with instructions to enter an order discharging Merchant on Count One of the indictment.

## FACTS

The State indicted Merchant for first-degree murder (Count One) and attempted first-degree murder (Count Two). The first trial began in August 2013. The jury venire was comprised of 50 potential jurors, including both Kira Criado ("Kira") and Kevin Criado ("Kevin"). At the commencement of the jury selection process, the trial court introduced the court staff, the attorneys, and the defendant. The attorneys were then asked to read to the jury venire a list of potential witnesses, to acquaint the jurors with the names of all persons who might testify at trial. The attorneys then read a list containing the names of eighteen witnesses (and, where appropriate, the police agency the witness worked for), after which the court stated:

2

Now you have met people here. You've heard names. Perhaps you've looked around the room. Does anyone recognize anyone else or think they know anyone or recognize any of the names? If so, just raise your hand.

One juror raised his hand and indicated that he might know one of the potential witnesses whose name was read. The court questioned the prospective juror to determine how the juror might know this witness, after which the court told the entire venire:

Now, when we ask some questions, you may not have an instant recollection. But when you go outside and you look around and you see who some of the other potential jurors are, you may realize, oh, I know this person or I've seen this person or I live by this person or I saw this person in the grocery or I'm friends with this person. Let us know. Let us know if that happens and that happens a lot, actually.

And, also, as you hear people speak, sometimes you think you might, you know, recognize them or you've heard the voice before.

So, keep us informed if you recognize any of us or anyone else or the potential jurors.

The record does not reflect that Kira or Kevin raised their hand or indicated that they knew each other.

Kira and Kevin's written answers to juror questionnaires indicated they have the same surname (Criado), are two years apart in age (19 and 21, respectively), live in Kendall, have lived in Miami-Dade County for their entire lives, have no children, and have an aunt who is an attorney.

During jury selection, the State questioned Kira, referring to her as Ms. Criado. Noting that Kira indicated on her questionnaire that her aunt is an

3

attorney, the State asked what type of law her aunt practiced. Kira responded that her aunt is a domestic violence prosecutor.

Thereafter, the State questioned Kevin, referring to him as Mr. Criado. The State elicited that Kevin lived with his parents in Kendall, had not graduated from high school or college, and was unemployed. The State asked: "Do you know [what] type of law you– I think we already asked this; what type of law your aunt practices?" Kevin responded that his aunt is a domestic violence prosecutor.

At no time during jury selection did the State, the defense or the trial judge ask Kira or Kevin whether they were related in any way. The parties accepted Kira as a juror, and subsequently accepted Kevin as one of three alternate jurors. The trial court swore the jury and, before releasing them for the evening, reminded them not to communicate with anyone about the case or the proceedings.

The next morning, before opening statements, the court confirmed the following: no juror had discussed the case with anyone; no one had tried to speak with any juror about the case; no juror had spoken with another juror about the case; and no juror had conducted independent research. When asked, all jurors answered "no" to these questions. The trial court delivered this same instruction to the jury before each lunch break and evening recess, and began the next day's proceedings by confirming that each juror had followed this instruction.

4

At the close of the evidence, the court instructed the jury and then sent the jury (which included Kira) to the jury room to begin deliberations. The court subsequently excused the alternate jurors (including Kevin). During deliberations, the jury sent out a note indicating it was deadlocked. The parties and the trial court agreed to advise the jury to continue deliberating. The jury then sent a second note indicating it had reached a result on Count Two, but remained deadlocked on Count One. After a discussion with the State and defense, the court again instructed the jury to continue its deliberations.

After the jury deliberated for three and a half hours, the court reconvened to notify the parties that the jury sent a third note indicating it was deadlocked. At that time, the court also raised the following issue:

> [Court]: Ladies and gentlemen, besides this note, another matter has just been brought to my attention. I was advised that one of our alternates, Mr. [Kevin] Criado, has indicated to Michael [the bailiff] because he has been sitting out there for whatever reason, that he is the brother of one of our jurors Ms. Kira Criado. They did not advise this Court because I asked in the beginning, "Does anyone know someone else on the jury?" And no one said anyone. Many times I have had potential jurors with the same last name so that is why we ask the question. They have not disclosed that this is a huge problem. If you give me your thoughts, I am going to tell you what I need to do at this point. I don't think I have an alternative.
>
> [Prosecutor]: I don't either judge.
>
> [Court]: On both counts, this Court is going to declare a mistrial. I am going to retry the case. No option. We can make an inquiry.
>
> [Defense Counsel]: How did they end up on the same panel?

5

[Court]: They did. That is why we ask the question. I know I asked the questions, "Do you know each other?" "Do you recognize anyone?"

[Prosecutor]: It was asked numerous times and to know they are now –

[Court]: And now certainly, I could not ever consider sending them home for the night.

[Prosecutor]: No.

[Court]: I am saying all this because we don't even know during the course of last week whether or not they had communications. They could sit here and tell me they didn't. I can make a presumption they are brother and sister, and I found out they have driven back and forth together, they must be talking about this. I want to temper my comments and I don't want to say something that is non-judicial.

[Prosecutor]: I don't think there is any way to say that it doesn't reach the level of manifest [injustice], that we have jurors who affirmatively misadvised of their relationship.

[Court]: This is what I am going to do. I am declaring a mistrial. I am resetting the case for trial immediately. I know this is very difficult for everyone, but I have no options…. What I am going to do is bring in all the jurors and I am just going to advise them that due to certain circumstances, the Court will declare a mistrial. I will make my speech and give them their certificate and I will ask Ms. Criado to stay in her seat and I will bring in Mr. Criado and have them both in here, and then we will have a conversation.

This transcript excerpt represents the entirety of the discussion that led to the court's declaration of a mistrial. After declaring a mistrial, the jury was brought back into the courtroom. The court discharged the jury, asked Kira to remain, brought Kevin into the courtroom, and addressed them both. The court advised

6

them it declared a mistrial upon learning they were brother and sister and acknowledged that although it asked the jury venire whether they knew other members of the venire, it was giving them the benefit of the doubt that they possibly didn't hear the questions. The court further told the siblings that their type of relationship is inherently conflicting, highlighting the "fact" that they rode to the courthouse together. Neither Kira nor Kevin was provided an opportunity to make any statement, answer any questions, or respond to the trial court's remarks.

Thereafter, the case was reset for trial. Merchant filed a motion to dismiss the indictment, contending that he did not consent to the mistrial, that there was no manifest necessity for the trial court's sua sponte declaration of a mistrial, and that retrial was therefore barred by double jeopardy.

In opposition, the State contended that by not affirmatively objecting to the mistrial, and in absence of demonstrable bad faith by the State, Merchant had essentially consented to the mistrial. The State did not agree with the defense's characterization that the court declared a mistrial sua sponte.

The trial court denied Merchant's motion, explaining:

I think the ultimate question becomes whether there is an inherent taint where siblings who live together, who are coming back and forth to the courthouse, who wind up without anyone knowing or realizing it sitting as same jurors on a case, whether it is just, there is just inherent common sense presumptions. I mean you tell jurors don't talk about the case, don't talk about the case, and you ask them every single – I ask them every single day the same question and to respond

7

in the negative I'm not sure I think was somewhat disingenuous just from common sense.

And so it's sadly the way I viewed it was somewhat of a nullity from the commencement and it wasted a lot of time and energy. Kind of like a dry run. So it was very frustrating that way.

[DEFENSE]: Yes.

THE COURT: And it was something that certainly I've learned from it to be even more meticulous during jury selection. That has never happened in all the cases that I've tried and it was very unusual. And so for those reasons I am respectfully denying your request to interview the jurors as well as your motion to dismiss the indictment. But it is well preserved.

The second jury acquitted Merchant on Count Two but convicted him of Count One of the indictment, first-degree murder. The trial court sentenced Merchant to life imprisonment. This appeal followed.

## ANALYSIS

We review this claim under an abuse of discretion standard. England v. State, 940 So. 2d 389 (Fla. 2006).

> The protection of an accused against being twice put in jeopardy for the same offense is a right guaranteed by both the Fifth Amendment to the United States Constitution and article I, section 9 of the Florida Constitution. Jeopardy attaches in a criminal proceeding when the jury is impaneled and sworn.

Thomason v. State, 620 So. 2d 1234 (Fla. 1993).

Once a jury is empaneled, the accused in a case has a right to be tried by that particular tribunal. Id. at 1237. This right, however, is not absolute:

8

For example, when the defendant requests declaration of a mistrial, double jeopardy usually is not a bar to reprosecution. Oregon v. Kennedy, 456 U.S. 667, 672, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416 (1982). Even in cases where a mistrial is declared over the objection of the defendant, the double jeopardy clause does not *guarantee* that a defendant cannot be retried. The right to have a trial concluded by a particular tribunal sometimes must give way to the public interest in allowing the State one "full and fair opportunity" to present evidence to an impartial jury. Arizona v. Washington, 434 U.S. 497, 505, 98 S.Ct. 824, 830, 54 L.Ed.2d 717 (1978). However, absent circumstances thwarting the State's one full and fair opportunity to present its case, the right of a defendant to completion of his or her trial by a particular tribunal should control.

Thomason, 620 So. 2d at 1237.

As noted by the United States Supreme Court in United States v. Dinitz, 424

U.S. 600 (1976), and reaffirmed by the Florida Supreme Court in Thomason,

The distinction between mistrials declared by the court sua sponte and mistrials granted at the defendant's request or with his consent is wholly consistent with the protections of the Double Jeopardy Clause. Even when judicial or prosecutorial error prejudices a defendant's prospects of securing an acquittal, he may nonetheless desire "to go to the first jury and, perhaps, end the dispute then and there with an acquittal."

Thomason, 620 So. 2d at 1237 (quoting Dinitz, 424 U.S. at 608.)

Doubt about the appropriateness of a mistrial is resolved in favor of the

defendant, and the State "must demonstrate 'manifest necessity' for the mistrial, a

requirement that has been part of this country's jurisprudence since 1824."

Thomason, 620 So. 2d at 1237 (internal citations omitted). Manifest necessity

requires that there be a "manifestly urgent and absolute necessity" for declaring a

mistrial.  Id. at 1239 (quoting State v. Grayson, 90 So. 2d 710, 713 (Fla. 1956)).

Moreover, manifest necessity requires that the trial court evaluate and discuss available alternatives prior to declaring a mistrial where the defendant does not consent to such an action.  "Manifest necessity for declaring a mistrial without the defendant's concurrence may be demonstrated only if the trial court has considered and rejected all possible alternatives." Torres v. State, 808 So. 2d 234, 235 (Fla. 2d DCA 2001). See also Thomason, 620 So. 2d at 1238 (observing that manifest necessity requires "trial judges, *at the very least*, to evaluate and discuss available alternatives before declaring a mistrial over the objection of the defendant.")

The State contended below, and on appeal, that Merchant should be deemed to have "consented" to the mistrial because neither he nor his counsel voiced an objection, thus waiving his right to later assert a double jeopardy bar to retrial. However, this position is without merit, as the law on this point is well-established: a defendant's mere failure to object to a declaration of mistrial is not tantamount to consent.  See State v. Grayson, 90 So. 2d 710, 713 (Fla. 1956) (noting that "silence of the defendant on trial for a crime or his failure to object" does not constitute consent to the trial court's declaration of a mistrial); McLendon v. State, 74 So. 2d 656, 657 (Fla. 1954)(finding "the defense of former jeopardy is not available to a defendant where mistrial is granted with his consent, approval or upon his motion or is granted where the circumstances show a manifest, urgent or absolute

10

necessity in the interest of justice."); Allen v. State, 41 So. 593 (Fla. 1906) (holding that the defendant's "silence or failure to object or protest against the discharge of the jury did not constitute a consent or a waiver of his constitutional right" of double jeopardy); Feria v. Spencer, 616 So. 2d 84 (Fla. 3d DCA 1993) (holding a "defendant's silence when the trial court granted the mistrial cannot be construed as consent."); Spaziano v. State, 429 So. 2d 1344, 1345 (Fla. 2d DCA 1983) (holding "[a] defendant's silence or his failure to object or protest against an illegal discharge of the jury before a verdict, does not constitute a consent, and is not a waiver of the constitutional prohibition against a subsequent trial for the same offense if the jury has been improperly discharged.")

Thus, absent the defendant's consent to the declaration of a mistrial, retrial is barred by double jeopardy unless the State meets its "heavy burden to show that the mistrial was justified by manifest necessity." Spaziano, 429 So. 2d at 1346. The record in the instant case reveals no manifest necessity for declaring a mistrial and further reveals that the trial court failed to evaluate, discuss or consider available alternatives before declaring a mistrial and discharging the jury.[1]

_____

[1] A trial court must evaluate and discuss available alternatives before declaring a mistrial even where the defendant does not expressly object, but merely remains silent. See, e.g., Lebron v. State, 799 So. 2d 997 (Fla. 2001) (applying rule where defendant did not object to trial court's declaration of a mistrial); C.A.K. v. State, 661 So. 2d 365 (Fla. 2d DCA 1995) (same). Whether a defendant expressly objects, or merely remains silent in the face of a trial court's decision to declare a mistrial, the record must establish the requisite "manifest necessity" to overcome a double jeopardy bar to retrial. The trial court conducted no inquiry of Kira or

11

The trial court's decision to declare a mistrial, without the consent of the defendant, appears to have resulted from a series of assumptions and inferences, rather than from competent record evidence. Even if we were to accept the assumption that Kira and Kevin are brother and sister, this surely did not—without more—necessitate a mistrial. There is nothing in the record to indicate that Kira and Kevin heard the trial court's request, made to the entire venire at the commencement of the jury selection process, for jurors to notify the court if any prospective jurors knew each other.[2] Similarly, there is no evidence in the record that Kira and Kevin discussed the testimony or evidence with each other, or otherwise violated the trial court's daily admonitions to the jury.[3] To the contrary,

Kevin and failed to inquire of Merchant's counsel whether he consented to a mistrial. We further observe that the prosecutor failed to alert the trial court to the potential double jeopardy bar should a mistrial be declared without Merchant's consent and without a record evidencing a manifest necessity for, and consideration of alternatives to, the declaration of a mistrial.

[2] As described at *2-3 *supra*, this request was but a minor part of a lengthy narrative made by the court after the attorneys had read to the fifty venirepersons a list of eighteen names of potential witnesses. The trial court asked whether any of the prospective jurors knew, or recognized the names of, any of the *potential witnesses*. The court told the jurors that even if they did not recognize the witness names that were read aloud, they might realize at some point during the proceedings that they in fact know one of the witnesses and that if this occurs, the jurors should notify the court. During this narrative, which focused almost exclusively on whether any juror knew any of the potential witnesses, the court asked the jurors to notify the court if any prospective juror knew any other prospective juror.

[3] In fact, the trial court itself acknowledged that it had no reason to believe that Kira and Kevin discussed the case with each other, and the court even told Kira

12

the trial court began each day of the trial by confirming that each of the jurors followed the court's instruction not to discuss the case with each other or anyone else. The trial court also ended each day (and prefaced every recess) by reminding jurors of this instruction.

Thus, the only information the trial court had before it was a statement from the bailiff that Kira and Kevin were siblings and that Kevin (having been discharged as an alternate juror) was waiting outside the courtroom to drive Kira home. This alone was hardly sufficient to warrant a mistrial. However, the court did not question the bailiff in open court or permit the attorneys to do so. The court did not bring Kevin Criado into the courtroom to question him or permit the attorneys to do so. The court did not bring Kira Criado into the courtroom to question her or permit the attorneys to do so. The court acknowledged the option of conducting an inquiry, but failed to engage in one.[4] And although the court

_____

and Kevin that it presumed neither of them violated the court's instruction.

[4] After declaring a mistrial and discharging the jury, the trial court brought Kira and Kevin into the courtroom to advise them that the mistrial was required because they had failed, during jury selection, to disclose their sibling relationship. The trial court never gave them the opportunity to address whether they were brother and sister; whether they had heard the trial court's request at the beginning of jury selection that they identify anyone (including other potential jurors) whom they may know; whether they drove to and from court together; or whether they had discussed the case with each other during the trial proceedings. The record wholly fails to support any of these factual "determinations" other than the out-of-court and unconfirmed statement made by Kevin (to the bailiff) that he and Kira were brother and sister.

13

indicated it was going to solicit the parties' input before making a decision, it did not actually do so. The court did not ask the defense for its suggestions or inquire whether the defendant agreed to a mistrial. The court did not solicit or receive any input from the State or defense regarding any possible alternatives to a mistrial. Instead, the court simply declared a mistrial, concluding it had "no option."

The trial court could have brought the bailiff into court to state on the record, and in the presence of the State, Defendant and his counsel, what he had been told by Kevin; brought Kevin into the courtroom to verify that he and Kira are siblings, and to answer questions regarding whether and why he failed to disclose this relationship during jury selection; brought Kira into the courtroom (out of the presence of the other jurors) to answer questions regarding whether and why she failed to disclose her relationship with Kevin during jury selection; questioned Kevin and Kira individually regarding whether they violated the trial court's instruction not to discuss the evidence and testimony with each other; or determined as a preliminary matter and based upon the answers provided during the questioning, whether any harmful conduct had in fact taken place and whether Kira could continue to serve as a juror in the case.[5] If such an inquiry affirmatively

[5] Events which arose earlier during the course of this trial establish that the trial court was aware of the propriety of such an inquiry: During the presentation of testimony, Juror Reddick informed the bailiff that Reddick recognized the last testifying witness as someone she had worked with. The judge brought Juror Reddick into the courtroom for questioning outside the presence of the other jurors. The court began by verifying with Juror Reddick that what the bailiff had reported

14

established that misconduct had occurred, the trial court could have then requested the State and defense to suggest available alternatives to a mistrial, or in the absence of any alternatives, to ascertain whether Merchant would consent to a mistrial.

Instead, the trial court presumed that irreparable harm had occurred, and that a mistrial was a manifest necessity. When the court advised the parties it was declaring a mistrial, it stated simply:

> [W]e don't even know during the course of last week whether or not [Kira and Kevin] had communications. They could sit here and tell me they didn't. I can make a presumption they are brother and sister, and I found out they have driven back and forth together, they must be talking about this.

The court's conclusions were based almost entirely on assumption, inference and speculation. Nowhere are these conclusions confirmed on the record, particularly the central assumptions that Kira and Kevin are siblings and that they

---

to the court was true. The court then posed a series of questions to Juror Reddick regarding how she knew the witness, the nature and extent of the relationship, and whether this would impact her ability to continue serving as a juror in the case. Thereafter, the court discussed the issue with counsel. After concluding that the issue could not be cured, and with the consent of the parties, the court excused the juror and replaced her with an alternate. Although concededly the issue regarding Kira is complicated by the fact that she and the other jurors had already begun their deliberations, see Williams v. State, 792 So. 2d 1207 (Fla. 2001), this did not relieve the trial court of its obligation to evaluate and discuss available alternatives before declaring a mistrial, or the requirement that the record establish the existence of a manifest necessity before a mistrial is declared without the defendant's consent.

15

discussed the evidence or testimony during the course of the trial. The trial court erred in failing to conduct any inquiry and, by relying instead on assumption, inference and speculation, abused its discretion in concluding that a mistrial was justified by manifest necessity. Baez v. State, 699 So. 2d 305 (Fla. 3d DCA 1997), is on point. In that case, the jury sent a note to the court during deliberations. The note stated: "One of the jurors has admitted to having a couple of beers at lunch. Is he qualified to help make a decision?" Solely on the basis of this note, and without further inquiry of any jury member, the trial court declared the juror incompetent to proceed and, after the defendant would not consent to continuing the deliberations with a five-person jury,[6] the judge declared a mistrial over defendant's objection. On a petition for writ of prohibition, we held that double jeopardy prohibited defendant's retrial:

> It is established that the court may appropriately declare a mistrial on its own or a prosecution motion only if, after an assiduous inquiry into the possibility of another course of action, there is a "manifest necessity" to do so. That condition was obviously not satisfied in the county court if only because, without any inquiry into the precise

---

[6] We note this was one possible alternative which the trial court in the instant case failed to consider, explore or discuss with the parties. See, e.g., Blair v. State, 698 So. 2d 1210 (Fla. 1997) (holding that a defendant may, upon a personal waiver and proper colloquy, waive his constitutional right to a six-person jury and agree to be tried by a five-person jury); Evans v. State, 939 So. 2d 168 (Fla. 4th DCA 2006) (conviction affirmed where, after jury deliberations began, one of the jurors indicated she knew witness who testified during trial; court gave defendant option of continuing the trial with five jurors or granting a mistrial, and following a court colloquy defendant made knowing and voluntary waiver of right to six-person jury and agreed to allow deliberations to continue with five-person jury).

16

condition of the allegedly impaired juror, there could be no showing that he was not competent to deliberate with the consequence that he need not have been excused at all.

Id. at 306 (internal citations omitted).

In the instant case, there was no inquiry, much less the "assiduous inquiry" alluded to in Baez. There was no record evidence to show that Kira or Kevin had engaged in any misconduct that warranted the declaration of a mistrial upon manifest necessity. In fact, the record contradicts the most critical assumption made by the trial court—that Kira and Kevin violated the trial court's instructions by discussing the case with each other during the trial. The record reveals that Kira and Kevin (and the rest of the jurors) uniformly responded "no" to each of the court's daily inquiries regarding whether the jurors spoke about the case with each other or with anyone else. Further, the trial court, after discharging the rest of the jurors, brought Kira and Kevin into the courtroom to explain that it had declared a mistrial. At that time, the trial court told Kira and Kevin: "And while I had no reason to think that you disregarded any of the Court's instructions as far as not communicating about the case, I have no reason to think that and I will not think that."

With regard to whether Kira and Kevin failed to disclose their relationship during jury selection, the trial court itself recognized that they might not have

17

heard the question when posed by the trial court, acknowledging that "perhaps you did not hear [that question] and I will give you the benefit of the doubt."

There is simply nothing in the record to support the trial court's apparent conclusions that Kira and Kevin spoke about the case while serving as jurors and that, during jury selection, Kira and Kevin failed to disclose their sibling relationship.

## CONCLUSION

The trial court's failure to make an inquiry, develop a proper record, and consider alternatives before declaring a mistrial forecloses a conclusion that a mistrial was even warranted, let alone one supported by manifest necessity. Given that the mistrial was declared without the defendant's consent, and in the absence of manifest necessity, double jeopardy precluded a retrial.[7] We are therefore

---

[7] We reject the State's argument that a mistrial was proper under De La Rosa v. Zequeira, 659 So. 2d 239 (Fla. 1995). Even if the De La Rosa analysis was applicable to this circumstance (a proposition we consider dubious), there is no record evidence establishing that Kira or Kevin failed to disclose information during jury selection; that such information was relevant and material to their jury service in the case; or that any failure to disclose the information was not attributable to the parties' lack of diligence. Id. at 241. For example, under De La Rosa, materiality is shown only where "the omission [of information] prevented counsel from making an informed judgment—which would in all likelihood have resulted in a peremptory challenge." Id. at 242. There is no evidence to support any finding of materiality, as the State never asserted, much less sought to establish, that it would have challenged either Kira or Kevin had it known of a sibling relationship. The record is also insufficient to determine whether any failure to disclose was attributable to counsel's lack of diligence. Neither counsel nor the court questioned whether these jurors were related, even though Kira and Kevin shared a relatively uncommon surname ("Criado"), were two years apart in

18

compelled to vacate the judgment and sentence on Count One of the Indictment, and remand with instructions to enter an order discharging Defendant as to Count One. See, e.g., Thomason, 620 So. 2d at 1240 (reversing conviction and ordering discharge of defendant where mistrial declared without manifest necessity and without defendant's consent); Chapinoff v. State, 2 So. 3d 1080 (Fla. 3d DCA 2009) (same); Dawson v. State, 979 So. 2d 1099 (Fla. 3d DCA 2008) (same); Feria, 616 So. 2d at 84 (issuing writ of prohibition precluding retrial of defendant).

Reversed and remanded with instructions to vacate the judgment and sentence and enter an order discharging Merchant.

---

age, both lived in Kendall, and both stated that they had an aunt who was a domestic violence prosecutor.

Generally, a facially sufficient allegation of juror misconduct under De La Rosa will often require further inquiry to provide record evidence bearing upon the three-pronged factors of concealment, materiality and diligence. Such a further inquiry is typically accomplished by way of a posttrial juror interview. See, e.g., Simon v. Maldonado, 65 So. 3d 8 (Fla. 3d DCA 2011); Pereda v. Parajon, 957 So. 2d 1194 (Fla. 3d DCA 2007); Bernal v. Lipp, 580 So. 2d 315 (Fla. 3d DCA 1991); Bolling v. State, 61 So. 3d 419 (Fla. 1st DCA 2011); Sterling v. Feldbaum, 980 So. 2d 596 (Fla. 4th DCA 2008); Forbes v. State, 753 So. 2d 709 (Fla. 1st DCA 2000). In the instant case, such a further inquiry could have been conducted with relative ease, and without the countervailing privacy implications normally associated with such a procedure, since the juror and discharged alternate juror were still present before the court and the trial proceedings were still ongoing.